JENNIFER BROWN, #10885
HAWAIʻI CIVIL RIGHTS PROJECT
(808) 554-5576
hawaiicivilrightsproject@gmail.com

DAVID B. OWENS*
LOEVY & LOEVY
 (312) 243-5900
david@loevy.com
*admitted *pro hac vice*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF HAWAIʻI

| | | |
|---|---|---|
| SEFO FATAI, | ) | CIVIL NO. 1:19-cv-603 JMS/WRP |
| | ) | |
| Plaintiff, | ) | FIRST AMENDED COMPLAINT FOR |
| | ) | DAMAGES AND OTHER RELIEF |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| CITY AND COUNTY OF  HONOLULU, | ) | |
| POLICE CHIEF LOUIS KEALOHA, | ) | |
| SERGEANT EDGAR NAMOCA, | ) | |
| LIEUTENANT MARK KAWASAKI, | ) | |
| OFFICER MARK RAMOS; OFFICER | ) | |
| FUMIKAZU MARAOKA, OFFICER | ) | |
| JOSHUA NAHULU, OFFICER B. | ) | |
| SUGAI, and JOHN and/or JANE DOES | ) | |
| 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff, SEFO FATAI, by and through his attorneys, JENNIFER BROWN,

and LOEVY & LOEVY, hereby complains against Defendants CITY AND COUNTY

OF HONOLULU, POLICE CHIEF LOUIS KEALOHA, SERGEANT EDGAR

1

First Amended Complaint

NAMOCA, LIEUTENANT MARK KAWASAKI, OFFICER MARK RAMOS; OFFICER

FUMIKAZU MARAOKA, OFFICER JOSHUA NAHULU, OFFICER B. SUGAI, and

JOHN and/or JANE DOES 1-10 (collectively "Defendants") and alleges as follows:

**INTRODUCTION**

1.  Plaintiff Sefo Fatai was wrongfully arrested, prosecuted, and
incarcerated for drug crimes he did not commit. Plaintiff is not a drug dealer and had
absolutely no arrests, let alone convictions or other history, related to the criminal
drug trade of narcotics. Nonetheless, Plaintiff was arrested and prosecuted for the
distribution of methamphetamine due to the misconduct of Honolulu Police
Department (HPD) officers, who knew Plaintiff was innocent but prosecuted him
anyway.

2.  In so doing, the HPD officers put false and misleading claims into their
reports; suppressed evidence of their own misconduct, including in manipulating
witnesses; hid the fact they knew Plaintiff was innocent and had manipulated and
coerced false witness statements; and secreted the fact they fabricated police reports
and warrant applications to deprive Plaintiff of liberty year after year. This heinous
ordeal, which began in 2011, did not end until 2018, when the bogus charges were
finally dismissed with prejudice.

3.  Through the course of some seven years, three of which he spent
wrongfully in custody, Plaintiff had to fight criminal charges that were not supported
by probable cause but, instead, were only made possible due to the fabricated and
untrue account created by HPD officers acting pursuant to the policies, practices, and

2

First Amended Complaint

customs of the City of Honolulu.

4.      Though nothing can bring back the time Defendants have taken from Plaintiff, this action seeks to hold accountable the actions of those who arrested, prosecuted, and framed Plaintiff for crimes he did not commit. In addition, this action seeks to deter officers within the City of Honolulu, whose policies, practices, and customs were the moving force behind the violation of Plaintiff's constitutional rights.

## PARTIES

5.      Plaintiff SEFO FATAI ("Plaintiff") is and was at all times relevant hereto, a citizen and resident of the City and County of Honolulu, State of Hawaiʻi.

6.      Defendant CHIEF LOUIS KEALOHA is and was at all times relevant hereto, a citizen and resident of the City and County of Honolulu, State of Hawaiʻi. Defendant Kealoha was the Chief of the Honolulu Police Department at all times relevant hereto and is sued in both his individual and official capacities.

7.      Defendants MARK RAMOS, FUMIKAZU MURAOKA, JOSHUA NAHULU, B. SUGAI, SERGEANT EDGAR NAMOCA, and LIEUTENANT MARK KAWASAKI were at all times relevant hereto, citizen and residents of the City and County of Honolulu, State of Hawaiʻi, were, at all times relevant, employed as police officers by the City and County of Honolulu; and are sued their individual capacities unless otherwise noted.

8.      Defendants JOHN and/or JANE DOES 1-10 (hereinafter jointly referred to as "DOE DEFENDANTS") are individuals whose true identities and capacities are unknown to Plaintiff and his counsel, despite diligent inquiry and investigations, and

3

First Amended Complaint

who acted as described more particularly below in connection with their breaches of duties and/or violations of law, and who in some manner or form not currently discovered or known to Plaintiff may have contributed to or been responsible for the civil rights violations, civil wrongs, and injuries alleged herein. The true names and capacities of DOE DEFENDANTS will be substituted as they become known to the Plaintiff. DOE DEFENDANTS are sued both in their individual and official capacities.

9.      At all times relevant to the events described in this complaint, Defendants KEALOHA, NAMOCA, and KAWASAKI were supervisors and/or the final policymaker for the Honolulu Police Department (together the "Supervising HPD Defendants"). The Supervising HPD Defendants were responsible for overseeing the prosecution of Plaintiff, and in that capacity they directed, reviewed, approved, and ratified decisions of the other Defendants, including but not limited to Defendants RAMOS, MURAOKA, NAHULU, and SUGAI (together the Police Officer Defendants"), as well as engaging in investigative activities themselves. The Supervising HPD Defendants had knowledge of the investigative steps taken and evidence generated by other Police Officer Defendants. The individually named defendants are referred to herein as the "Individual Defendants."

10.     Defendant CITY AND COUNTY OF HONOLULU is and was at all times relevant hereto, a duly organized municipal corporation in the City and County of Honolulu, State of Hawai'i. The City and County of Honolulu ("City" or "Honolulu") is or was the employer of the Individual Defendants named above. The City is responsible for indemnifying judgments against the Individual Defendants. In

4

First Amended Complaint

addition, it is liable for all torts the Defendants committed pursuant to the doctrine of respondeat superior. Finally, it is liable for violations of Plaintiff's rights caused by the unconstitutional policies and customs of the City and County of Honolulu, including actions of Individual Defendants undertaken pursuant to those policies and customs during the prosecution of Plaintiff. The Supervising HPD Defendants and others had final policymaking authority for the policies and customs of the Honolulu Police Department. The City and County of Honolulu is referred to as "Honolulu" in this complaint.

## JURISDICTION AND VENUE

11.     The claims asserted present a question of federal law thereby conferring jurisdiction upon this court pursuant to 28 U.S.C. §§ 1331, 1334(3).

12.     This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper under 28 U.S.C. § 1391(b) as, on information and belief, Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district in the State of Hawai'i.

## FACTUAL ALLEGATIONS

### Plaintiff Is Innocent

14.     In 2011, Plaintiff Sefo Fatai worked as a laborer, had stable housing, and was a mechanic by trade.

15.     Plaintiff was not involved in the drug trade whatsoever.

First Amended Complaint

**Defendants Use Threats and Promises To Manufacture An "Informant" To Participate in a Controlled Buy**

16.     Unbeknownst to Plaintiff, the Police Officer Defendants had decided to make a "deal" with a woman, Kristine Medford, to attempt to arrest someone for drug trafficking charges. The Police Officer Defendants never disclosed this "deal" to Plaintiff's criminal defense attorneys or Honolulu prosecutors.

17.     This plan began after Defendant Ramos pulled Medford over and found methamphetamines in her car.

18.     This was the first time Defendant Ramos had met this woman and none of the other Police Officer Defendants were familiar with Medford either.

19.     Upon finding the methamphetamine, Defendant Ramos made Medford a threat—to implicate someone else in the drug trade as a "confidential informant" or face felony prosecution and arrest herself.

20.     Defendant Ramos also made a promise: favorable treatment in the criminal justice system by Defendants if she provided assistance to act as an informant.

21.     The remaining Police Officer Defendants met with Ramos and agreed to institute this plan, which was further approved by the Supervising HPD Defendants.

22.      The Police Officer Defendants knew that Medford was likely to be completely unreliable as an informant and buyer, as they had never worked with her before and she had a lengthy criminal history, including other arrests and convictions for crimes relating to drugs and dishonesty.

23.     Defendants also knew that Medford was likely using methamphetamines

First Amended Complaint

regularly, which they knew negatively impacted her reliability.

24.    Defendants knew that working with an informant in a drug case requires strict protocol, given that such informants can, and sometimes have, taken money or drugs in what are supposed to be "controlled" buy situations.

25.    Defendants also knew that working with an informant/buyer in a drug case, where the impetus for doing so is avoiding a serious felony charge requires that any action taken pursuant to an agreement to work as an informant be done voluntarily, and without threat.

26.    Nonetheless, with approval from the Supervising HPD Defendants, the Police Officer Defendants made both promises and threats to Medford to convince her to serve as an informant and participate in a controlled by.

27.    As part of this, Defendants told Medford they wanted her to provide them with access to her drug supplier, not a mere drug "user."

28.    The Police Officer Defendants also made threats to Medford about not seeing her children if she did not comply with their wishes.

29.    Defendants were searching for a higher-level drug dealer and pressured Medford to lead them to one, even though they knew revealing such information could endanger the life of Medford and/or her children.

30.    In light of Defendants threats—including those that would take her from her children—and other promises and incentives, Medford was compelled to serve as an "informant" and participate in a controlled "buy" for the Individual Defendants.

31.    The Supervising HPD Defendants approved of these acts and the Police

First Amended Complaint

Officer Defendants' plan.

32.     Medford was unwilling to provide the Police Officer Defendants with the true identity of her drug supplier and was, unsurprisingly, unwilling to set up the person who actually supplied her with methamphetamines.

33.     The Individual Defendants had coerced and/or incentivized Medford to do a sort of "controlled buy" of methamphetamines, whereby Defendants would provide Medford with cash to purportedly use to purchase drugs. The full extent of Defendants actions in coercing and/or making promises to Medford remain unknown to Plaintiff, as they still have not been fully disclosed.

34.     Medford contacted Tanya Waller, whom she owed money.

35.     Waller ran her own business planting seeds and cleaning homes and residential buildings and was not a drug dealer.

36.     Nonetheless, Medford called Waller and asked her to meet her, saying she had the money she owed.

37.     Waller was unavailable and asked Plaintiff to run this errand for her and get the money owed as a debt.

38.     Though they easily had the ability to do so, the Individual Defendants did not monitor or listen to the phone call between Medford and Waller.

39.     Instead, when Medford arranged to meet with Waller she used her own personal cell phone, which was not being monitored or recorded and had not been "tapped."

40.     Waller told Medford that she was going to send Plaintiff, who she

8

First Amended Complaint

referred to as "Junior," to retrieve what she thought was payment for a debt.

41.     As with the phone call, the Individual Defendants took no precautions in setting up the purported controlled buy they had coerced and/or incentivized Medford to participate in.

42.     For example, on August 25, 2011, the Individual Defendants gave Medford $1,900 to complete the purported drug buy but Defendants did not mark or add any special identifiers to this money, despite knowing that, for a controlled buy to be successful, the officers would need to be able to confirm that the money they provided the informant was later recovered by the suspect as the purported seller of the drugs.

43.     Before giving Medford the money, the Police Officer Defendants did not conduct a search of Medford to ensure that she did not have any drugs, weapons, or other paraphernalia in her possession.

44.     The Police Officer Defendants also permitted Medford to drive her own, private vehicle, which they also did not search.

45.     The Police Officer Defendants did not have Medford wear a "wire" or other device that would have recorded the interactions with the purported drug seller.

46.     Nor did the Police Officer Defendants set other parameters for the buy, like requiring it to take place in a location where the officers could actually observe a transaction take place.

47.     As she had just days before when Defendant Ramos pulled her over, Medford still had methamphetamines in her possession and in her car.

9

First Amended Complaint

48.     The meeting place was a Chuck E. Cheese parking lot.

49.     More than an hour transpired between when Medford obtained the $1900 from the Police Officer Defendants before she met Plaintiff.

50.     Prior to August 24, 2011, neither Medford nor the Police Officer Defendants had ever spoken to or otherwise interacted with Plaintiff.

51.     Plaintiff has no history, criminal or otherwise, of being a drug user or seller.

52.     The Police Officer Defendants and Medford knew Plaintiff would be driving a 1999 silver Lexus.

53.     The Police Officer Defendants had the ability to try to identify Plaintiff from his car licensing information, which would have illustrated no history of drug trafficking or the like.

54.     When Plaintiff drove to the Chuck E. Cheese parking lot, the Police Officer Defendants were able to run his plates and determine his identity and background.

55.      Plaintiff had absolutely no idea that the Police Officer Defendants had coerced and/or incentivized Medford to attempt to have him engage in a controlled buy despite his innocence.

56.     Acting pursuant to the plan the Police Officer Defendants had created and convinced her to follow, and as approved by the Supervising HPD Defendants, Medford approached Plaintiff's automobile from the passenger side, and without asking permission, entered Plaintiff's automobile from the front passenger side.

10

First Amended Complaint

57.     Though some of the Police Officer Defendants, all in plain clothes, were positioned in strategic locations near the Chuck E. Cheese none of them were in a position to actually observe, monitor, or listen to any interactions between Plaintiff and Medford inside the car.

58.     Nor did the Police Officer Defendants take any efforts to have Medford remain in plain sight and not get in Plaintiff's car.

59.     Once she was inside the vehicle, Plaintiff asked Medford for the $100 that he was supposed to be picking up for Waller.

60.     Instead of handing Plaintiff the $100, Medford tried to give Plaintiff a small plastic baggie of methamphetamine.

61.     Plaintiff refused to take the drugs, and refused to use the drugs as a substitute for the debt Medford owed Waller.

62.     The Police Officer Defendants watched Medford get out of Plaintiff's car, get into her vehicle and drive away.

63.     The Police Officer Defendants observed that Medford did not have anything in her hands, and did not see anything indicative of drugs that she had just supposedly purchased from Plaintiff.

64.     The Police Officer Defendants did not follow Medford, did not conduct an immediate search, and did not monitor her movements.

65.     As Plaintiff left the Chuck E. Cheese parking lot, he was immediately followed by two motorcycle officers, Doe Defendants, who followed him. As did Defendant Murakoa.

First Amended Complaint

66.     As Doe Defendants and Defendant Murakoa were following Plaintiff, they were able to run his plates and get his background information, which was not in any way consistent with being a drug dealer.

### Defendants' First Attempt at A "Controlled Buy" Fails and Shows Plaintiff's Innocence

67.     Nonetheless, the Police Officer Defendants instructed the Doe Defendants pull Plaintiff over and conduct an extensive search of his Lexus.

68.     The Police Officer Defendants knew that they needed to recover the $1900 in order to attempt to implicate Plaintiff in a controlled buy.

69.     Plaintiff was pulled over by the two motorcycle officers, Doe Defendants, who did not indicate why they stopped Plaintiff. Though he had not committed any crime, Plaintiff was ordered to get out of his vehicle.

70.     Doe Defendants, in view of Defendant Murakoa who was parked there, thoroughly searched Plaintiff's person, including his pockets, socks, and shoes.

71.     Doe Defendants then thoroughly searched Plaintiff's automobile including the interior passenger compartment as well as the trunk.

72.     During the search, the officers did not find any drugs in the car or in Plaintiff's possession whatsoever.

73.     During the search, the officers did not find any money, and did not find the $1900 in buy money.

74.     Eventually, Plaintiff was released and falsely told he had been stopped for a traffic violation, though he was not given a ticket.

75.     Meanwhile, Medford was driving over five miles away from the Chuck E.

First Amended Complaint

Cheese to a pre-arranged meeting place, the parking area near Walmart in Kunia.

76.     Medford was not visually observed or visually monitored by the Police Officer Defendants as she drove her personal vehicle from Chuck E. Cheese to Kunia, even though there were ample officers on hand and they knew that ensuring Medford was closely monitored was important.

77.     The Police Officer Defendants knew that, to have a successful drug buy, they needed to be able to link any drugs from the "buyer" (Medford) to a suspect, which required ensuring that any drugs did not come from any other source, that no drugs were taken, hidden, or ingested by the buyer, or otherwise compromised.

78.     The Police Officer Defendants also knew that they would need to be able to recover any of the $1900 from Medford that she had not given Plaintiff.

79.     In this circumstance, that was the entire $1900.

80.     Nonetheless, between the time Medford left the Chuck E. Cheese parking lot, until the time she finally met with the Police Officer Defendants in Kunia, Medford was afforded significant opportunity to hide or otherwise secret the $1,900 in buy money provided to her by the Police Officer Defendants.

81.     Even though no officer saw Medford exit Plaintiff's vehicle with any package, container, or items in her hand or on her person, Medford gave Defendant officers a Crystal Light box which contained a clear Ziploc baggie with approximately two ounces of methamphetamines inside, which Medford claimed to have purchased from Plaintiff.

82.     The Police Officer Defendants knew that Medford's claims did not add up.

First Amended Complaint

83. For example, Medford did not offer the Police Officer Defendants any money as change, which Defendants expected (as they expected her to buy much less than $1900 worth of methamphetamine).

84. The officers had also not observed Medford with the Crystal Light box, or anything remotely resembling it when she walked from Plaintiff's car back to her own.

85. Nonetheless, even after finding absolutely no buy money or drugs on Plaintiff, the Police Officer Defendants still did not search Medford and did not search her car.

86. At this point it was obvious that Medford had not engaged in any drug exchange with Plaintiff but that the officers had lost $1900 in Department money, and they needed to make up for their glaring mistakes.

87. Contrary to standard undercover narcotic police practice contained in the Honolulu Police Department's Narcotics/Vice Narcotics Operational Plan, as approved by the Supervising HPD Defendants, the Police Officer Defendants followed an unwritten practice of ignoring basic routine procedures required for officers dealing with informants in undercover drug investigations.

88. Such practices include but are not limited to the fact that the Police Officer Defendants did not:

   a. conduct a search of Medford before and after the transaction;

   b. give Medford a recording device or otherwise utilize any form of audio monitoring, like a wire or microphone;

   c. position themselves in places where they could observe any actual

14

First Amended Complaint

transaction;

d. require that any interactions between Medford and Plaintiff take place in plain view;

e. record the serial numbers on the $1,900 in bills given to Medford; or

f. photocopy the $1,900 in bills prior to giving them to Medford.

89.     Additionally, the Police Officer Defendants allowed Medford to use her personal cell phone and did not monitor or otherwise verify her communications with Waller or Plaintiff.

90.     The Defendant Officers knew that Medford was unreliable and that she had absconded with the money.

91.     The Defendant Officers knew they had targeted the wrong —Plaintiff Sefo Fatai—who was totally innocent,

## Despite Obvious Evidence of Innocence, the Police Officer Defendants Insist on Falsely Prosecuting Plaintiff

92.     Rather than admitting their mistakes, and that they had lost department funds and had unlawfully searched and detained a totally innocent person, the Police Officer Defendants "doubled down" and sought to cover-up their misconduct by insisting on prosecuting Plaintiff.

93.     In particular, despite having absolutely no probable cause, the Police Officer Defendants sought to search Plaintiff further and to secure his arrest and deliberately put false and/or misleading information into probable cause affidavits and intentionally omitted information that would have illustrated the absence of probable cause and that Plaintiff was innocent.

15

First Amended Complaint

94.     For example, the Police Officer Defendants wrote reports suggesting Medford had approached them implicating Plaintiff, when, in fact, Defendants had either coerced and/or incentivized (though some form of promise or deal) Medford to serve as an informant, even though she did not want to whatsoever.

95.     Likewise, the Police Officer Defendant officers falsely claimed that Medford was a reliable informant, when they knew that she was not.

96.     In the same vein, and to bolster their other deceptions, Defendants claimed Medford had been utilized as an informant on prior investigations for some six months before the rendezvous involving Plaintiff, when this was false—she had never assisted on any other cases, was coerced and/or incentivized into doing so here, and then provided no helpful information but actually took off with the money.

97.     In their warrant applications, the Police Officer Defendants also omitted the fact that they had coerced Medford to participate and that Plaintiff was searched immediately after the purported transaction but had no drugs or buy money whatsoever.

98.     The Police Officer Defendants repeated these lies, omissions, and misrepresentations from their probable cause affidavits in their police reports about the investigation of Plaintiff.

99.     Defendants never disclosed to Plaintiff or his defense attorneys or even prosecutors the entirety of their tactics with Medford, the types of promises they made to her, or the fact they had lied in affidavits and police reports.

16

First Amended Complaint

100.    Upon information and belief, despite knowing Plaintiff was innocent, and having learned so during the first "buy" effort, the Police Officer Defendants, with the approval of the Supervisor HPD Defendants, went back to Medford and forced and/or further incentivized her with a deal to again attempt a controlled buy with Plaintiff.

101.    This time, upon information and belief, and despite evidence of Plaintiff's innocence the Police Officer Defendants specifically required that Medford attempt to implicate "Junior" a second time.

102.    Two days after the first failed "buy," the Police Officer Defendants had Medford set up another meeting with Plaintiff by making a phone call. Again, the Police Officer Defendants did not monitor the call.

103.    The meeting spot was the Foodland parking lot in Ewa Beach.

104.    Knowing they could not trust Medford with any money (and despite their false claims she was trustworthy in the probable cause affidavits and their fabricated reports), the Police Officer Defendants knew they needed to attempt to "catch" Plaintiff with drugs himself if they were going to be able to have any chance of pinning the prior two ounces of meth on Plaintiff.

105.    But, this plain was obviously fraught: Plaintiff had no drugs, and though he was merely trying to get money on behalf of Waller, due to the $100 debt Medford owed. Plaintiff was also obviously innocent.

106.    This time, when Plaintiff pulled into the parking lot of Foodland and parked his car, the Police Officer Defendants approached Plaintiff's driver's side

17

First Amended Complaint

door and ordered Plaintiff out of the car.

107.   As he was being detained and his car was searched Plaintiff was repeatedly asked "where is the dope" and "where is the money."

108.   Plaintiff honestly responded that he did not have either.

109.   Defendants were able to confirm this fact as well.

110.   For the second time in a matter of a few days, Plaintiff and Plaintiff's car were thoroughly searched. Again, no money, drugs, or contraband was found on Plaintiff or in Plaintiff's car.

111.   Plaintiff was obviously innocent and there was *no* evidence to suggest he was involved in trafficking methamphetamines, a fact that this "surprise" search of Plaintiff and his car yet again confirmed.

112.   Plaintiff's obvious innocence and the lack of evidence did not stop Defendants from falsely arresting Plaintiff, despite the absence of probable cause to suspect him of a crime.

113.   Instead, while the Police Officer Defendants knew Medford was not trustworthy and that Plaintiff was innocent, they still had to attempt to make up for their mistakes, including the fact they had lost the $1,900 in buy money.

114.   Had the Police Officer Defendants revealed their lies (in their police reports and probable cause affidavits) and misconduct (particularly in how they coerced and/or incentivized Medford), Plaintiff never would have been charged with a crime. Instead, in fabricating evidence, Defendants built a false case around Plaintiff, despite his obvious innocence.

First Amended Complaint

115.   To this day, Defendants have failed to admit the extent of their own misconduct and the entire scope of the actions they took (including in fabricating evidence and in manipulating Medford) to falsely implicate Plaintiff.

116.   Nonetheless, because they were part and parcel of the practices of the Honolulu Police Department and Honolulu, the Supervising HPD Defendants approved the acts, omissions, and conduct of the Police Officer Defendants.

117.   Having already decided to focus on Plaintiff, and having already unlawfully stopped him twice, the Police Officer Defendants, with approval of the Supervising HPD officers directly, agreed to arrest, charge, and prosecute Plaintiff for crimes they knew he did not commit.

118.   Indeed, the Police Officer Defendants ignored best practices, and even written HPD policies for their own faulty practices, which were approved of by the Supervising HPD Defendants.

119.    Upon arresting Plaintiff, the Police Officer Defendants illegally seized Plaintiff's automobile, a 1999 Lexus, without probable cause and subjected his car to "forfeiture" as a result of drug dealing, even though that was untrue and there was no lawful basis of justification for so doing.

120.    To support this "forfeiture," the Police Officer Defendants repeated the lies they put in other documents, including their warrant affidavits and police reports, falsely implicating Plaintiff, omitting their misconduct, and mischaracterizing the result of their work that illustrated Plaintiffs' innocence.

First Amended Complaint

## Criminal Proceedings Against Plaintiff

121.   Based upon the false, misleading, and fabricated evidence and warrant applications Plaintiff was indicted for a serious felony—methamphetamine trafficking.

122.   Despite knowing that the Police Officer Defendants had not followed the written policy for informant controlled buys but acted according to unlawful practices of the City, the Supervising HPD Defendants authorized, approved of, and endorsed the the false and flawed investigation reports and documents, which were used to further the prosecution of Plaintiff.

123.   Between 2011 and 2108 Plaintiff was subject to ongoing criminal prosecution for drug trafficking crimes he did not commit, where he was forced to sit through numerous criminal proceedings, including four trials, based upon fabricated evidence and false and misleading probable cause affidavits.

124.   Upon information and belief, to attempt to get Medford to provide false and misleading testimony in an effort to secure Plaintiff's wrongful conviction, the Police Officer Defendants continued to use threats and pressure to attempt to coerce her to testify and commit perjury by saying Plaintiff sold her drugs when, in fact, he had not and the Police Officer Defendants knew he had not as well.

125.   For example, in 2014 Medford was arrested once again by officers of the Honolulu Police Department for possessing drugs and paraphernalia. To avoid these charges, and through additional agreement and threats by the Police Officer Defendants, Medford was pressured to testify against Plaintiff at his second criminal trial, and to make up additional false allegations against Plaintiff, which she did.

First Amended Complaint

126.    As a result, additional conditions were placed upon Plaintiff's bond, and his bond was eventually revoked and Plaintiff was incarcerated at the Oahu Community Correctional Center, where he then spent three years imprisoned fighting the bogus charges, including after the second trial resulted in a mistrial and the third trial ended in a hung jury. Between the third and fourth trials Plaintiff was offered a plea for credit for time served and probation, but Plaintiff refused to plead guilty to something he did not do, and so his case was scheduled for a fourth trial which ended when Medford refused to appear.

127.    It was not until January of 2018 when the bogus drug charges were finally dismissed with prejudice.

128.    Upon information and belief, even after Plaintiffs arrest and the charges against him, Medford was also offered additional deals in exchange for testifying against Plaintiff, including mere probation on other serious drug charges resulting from the 2014 arrest. The terms of these deals were never provided to Plaintiff or his criminal defense attorney, even as the cause proceeded to trial.

129.    Had Defendants disclosed their own misconduct, the deals they offered to Medford, and that they knowingly prosecuted an innocent man, Plaintiff would have never been arrested let alone prosecuted or made to stand trial four times for crimes he did not commit.

### The City's Policies, Practices, and Customs

130.    As a matter of practice, the City permits officers to present false evidence in support of criminal charges that should never have been brought.

21

First Amended Complaint

131.    For example, in July 2013, Defendant Kealoha and other Honolulu Police Department undercover officers engaged in filing false reports resulting in an innocent man, Gerard Puana, being charged with a federal crime for allegedly stealing Defendant Kealoha mailbox. On June 27, 2019, Defendant Kealoha, and other Honolulu Police Department officers were found guilty of conspiracy and obstruction of justice in that case.

132.    Upon information and belief, the prosecution of Plaintiff falls into a similar practice of what happened to by Defendant Kealoha in Puana's case.

133.    In particular, HPD permits its officers and encourages certain witnesses, like Medford, to intentionally cause mistrials to attempt to force people to accept pleas to avoid criminal prosecution that should have never been brought. In this case, acting as a result of the pressure and coercion and/or undisclosed incentives and deals made by the Police Officer Defendants, Medford attempted to, and was able to, obtain a mistrial.

134.    Likewise, Defendant Kealoha, the policymaker for the City, actively engaged in similar tactics of intentionally causing mistrials in order to cover up official police misconduct and keep the truth buried. In December 2104, in the federal trial *U.S.A. v. Gerard Puana* (case no: 1:13-cr-00735), Defendant Kealoha was called as a witness for the Government. Defendant Kealoha intentionally testified in a manner that he knew would cause a mistrial, which in fact caused a mistrial. Defendant Kealoha intentionally caused the mistrial to prevent the court from discovering that he and other undercover police officers falsified reports in order to

First Amended Complaint

charge Gerard Puana with a federal crime, despite knowing Gerard Puana was innocent.

135.   The Honolulu Police Department under Defendant Kealoha had a policy and practice of knowingly causing mistrials to cover up their own wrongdoings, and this policy and practice was used by Medford in Plaintiff's second trial in 2015.

136.   Separately, under Hawai'i Revised Statute § 712A, the Honolulu Police Department has a large financial stake in forfeiture. The Honolulu Police Department receives 25% of forfeiture proceeds, with 25% going to the prosecuting attorneys, and 50% going to the Attorney General for the State of Hawai'i.

137.   The Honolulu Police Department has a policy and practice of using Hawai'i Revised Statute § 712A as a way to generate profit and seize property of citizens without probable cause or reasonable suspicion of illegal activity, in violation of the Fourth Amendment of the Constitution of the United States.

138.   From 2001 to 2014, the Honolulu Police Department accounted for 46.5% of the asset forfeitures in the entire state of Hawai'i, more than any other police department or state agency.

139.   Many citizens, such as Plaintiff, cannot afford to pay either the required up front bond of $2,500.00 or 10% of the estimated value of the property seized, therefore allowing the Honolulu Police Department to take from the poor without any oversight to ensure that the process is fair.

140.   Plaintiff's vehicle was taken by Defendants and "forfeited," without probable cause; and, even though he is innocent of the charges and never convicted.

First Amended Complaint

Using Hawaiʻi Revised Statute § 712A in the manner done by Defendants is unlawful and done to enrich the City for profit and ill-gotten gains it should have never had and, should return at any rate.

141.   Nonetheless, Defendants have refused to return Plaintiff's "forfeited" items, including his car. Because Defendants use the forfeiture statute for profit, they have no mechanisms for innocent citizens, like Plaintiff, to obtain their seized property, even when the person is innocent and the criminal charges have been dismissed.

142.   Instead, it is the practice and custom of the City, which Defendants invoked here, to refuse to return seized items, even if seized unlawfully and even following the completion of a criminal case that is later dismissed.

143.   Upon information and belief, even after the charges against Plaintiff were dismissed with prejudice, the City, including through the actions of the Supervising HPD Defendants, have approved the conduct of the Police Officer Defendants here, including the Individual Defendants decisions to put false and misleading information in warrant applications, in police reports, in coercing and manipulating witnesses, and in failing to disclose exculpatory evidence (including officers' own misconduct as well as "deals" made in exchange for false inculpatory testimony), the practice of causing mistrials to apply pressure to innocent defendants to accept false pleas, and in seeking prosecution of people without probable cause.

**Plaintiff's Damages**

144.   Plaintiff suffered over seven years fighting the bogus charges and

24

prosecution that were perpetrated against him by the Police Officer Defendants, with the approval of the Supervising HPD Defendants, and pursuant to the practices of Honolulu.

145.    Three of those years Plaintiff suffered in custody, where he was faced with terrible conditions due to over-crowding at the Oahu Community Correctional Center, including sleeping on the floor near toilets, the threat of violence from other inmates, and the restraint upon his liberty. While detained, Plaintiff was deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

146.    As a result of these charges, Plaintiff's life was truly upended. In addition to causing Plaintiff the severe trauma of wrongful imprisonment and the stress of charges hanging over his head for years while out on bond, loss of his liberty, and reputational harm, the Defendants' misconduct continues to cause Plaintiff physical and psychological pain and suffering, humiliation, fear, nightmares, anxiety, depression, and despair, rage, and other physical and psychological effects and he has suffered emotional harm and great anguish, which continues to this day.

## <u>COUNT I</u>
### 42 U.S.C. § 1983 – Illegal Detention and Prosecution
### Against the Individual Defendants

147.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

148.    In the manner described more fully above, the Individual Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law

First Amended Complaint

and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

149.    In so doing, the Individual Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. Plaintiff was deprived of his liberty, after the issuance of process based upon Defendants false and/or misleading affidavits and statements both while awaiting trial while on bond and, later, when he was jailed for more than three years.

150.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with malice.

151.    As a result of the Police Officer Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

152.    The Police Officer Defendants' misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

## COUNT II
### 42 U.S.C. § 1983 —Illegal Seizure Against the Individual Defendants

153.    Plaintiff incorporates each paragraph of this complaint as if fully stated

26

First Amended Complaint

herein.

154.   In the manner described more fully above, the Individual Defendants, while acting individually,  jointly, and/or in conspiracy with each other, as well as under color of law and within the scope  of their employment, deprived Plaintiff of his Fourth Amendment constitutional right to his own property when, without probable cause, they unlawfully used asset forfeiture to seize items belonging to Plaintiff and never return them, even after all of the charges against Plaintiff have been dismissed.

155.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

156.   As a result of the Defendants' misconduct described in this count, Plaintiff suffered loss of property and money, and suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

157.   The Individual Defendants' misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

## <u>COUNT III</u>
### 42 U.S.C. § 1983 – Violations of the Fourteenth Amendment, Due Process Against the Individual Defendants

158.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

159.   As described, the Individual Defendants, while acting individually,

27

First Amended Complaint

jointly, and/or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and his right to a fair trial.

160.   In the manner described more fully above, the Individual Defendants withheld exculpatory and impeachment from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution, including: evidence of coercion and threats made to manipulate witnesses to falsely implicate Plaintiff despite knowing he was innocent; evidence of deals and promises made to incentivize false inculpatory testimony against Plaintiff; their own misconduct in coercing and fabricating evidence and testimony; and that they had fabricated police reports and warrant affidavits.

161.   The Individual Defendants knew there was no credible evidence tying Plaintiff to drug trafficking of methamphetamine. Had they disclosed this exculpatory evidence, the evidence would have proved Plaintiff's innocence, cast doubt on the entire police investigation and prosecution, and led to the end of Plaintiff's detention and prosecution.

162.   In addition, on information and belief, the Individual Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

163.   In addition, as described more fully above, the Individual Defendants fabricated and solicited false evidence, including witness statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, obtained charges against Plaintiff, forced Plaintiff to endure four criminal

trials and spend years imprisoned in jail based upon that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal prosecution, including at his trials. In fabricating evidence, the Individual Defendants also used coercive and improper tactics they knew were likely to lead to the generation of false and unreliable evidence, and continued to generate and rely upon such evidence despite knowing Plaintiff was innocent.

164.   The Individual Defendants performed the above-described acts under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and Plaintiff's rights and with deliberate indifference to Plaintiff's clearly established constitutional rights.

165.   As a result of the Individual Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

166.   The Individual Defendants' misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

**COUNT IV**
**42 U.S.C. § 1983 – Failure to Intervene**
**Against the Individual Defendants**

167.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

168.   In the manner described above, during the constitutional violations

29

First Amended Complaint

described above, one or more of the Individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

169.   These Individual Defendants had a duty and reasonable opportunity to prevent this harm to Plaintiff, but they failed to do so.

170.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

171.   As a result of the Individual Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

172.   The Individual Defendants' misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy
### Against the Police Officer Defendants

173.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

174.   The Individual Defendants reached an agreement among themselves to frame Plaintiff for drug trafficking crimes he did not commit, and thereby to deprive Plaintiff of his constitutional rights, as described above. This agreement was first

First Amended Complaint

reached before arresting Plaintiff, and it remained in place throughout all periods of his wrongful detention, prosecution, and incarceration.

175.   In addition, the Individual Defendants conspired before Plaintiff's arrest, and continued to conspire after he was charged and through various phases of his criminal prosecution to deprive Plaintiff of exculpatory material to which he is entitled and that would have led to his earlier exoneration.

176.   In this manner, the Individual Defendants, acting in concert with each other and with other co-conspirators, known and unknown, conspired by concerted action to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

177.   In furtherance of the conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in joint activity.

178.   As a result of this illicit prior agreement, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

179.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

180.   The Individual Defendants' misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

**COUNT VI**
**42 U.S.C. § 1983 – Policy & Custom Claims**
**Against Honolulu**

31

First Amended Complaint

181.   Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

182.   Plaintiff's injuries described in this complaint and the violations of his constitutional rights discussed above were caused by the policies and customs of Honolulu, as well as by the actions of policy-making officials for Honolulu.

183.   At all times relevant to the events described in this complaint and for a period of time before and after, Honolulu failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of officers in using informants, setting up "controlled buys," the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

184.   In addition or alternatively, Honolulu failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the Honolulu Police Department, with respect to using informants, setting up "controlled buys," techniques to be used when questioning criminal suspects and witnesses; the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative

First Amended Complaint

notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

185.   Honolulu has also adopted unwritten practices, despite its written policies, that allow officers to using informants, setting up "controlled buys," produce false and misleading documents, and otherwise target investigations at innocent people, as described above, making its written guidance entirely ineffective.

186.   Officers and agents of Honolulu committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures and the adoption of unwritten practices "off the books." Honolulu promulgated and enforced appropriate policies and practices, then the violation of Plaintiff's constitutional rights would have been prevented.

187.   In addition, at all times relevant to the events described in this complaint and for a period of time before, Honolulu had notice of a practice and custom by officers and agents of the Honolulu Police Department and City and County of Honolulu pursuant to which individuals suspected of criminal activity, like Plaintiff, were falsely implicated in crimes they did not commit through the use of unreliable informants and other people actually involved in drug trafficking.

188.   In addition, at all times relevant to the events described in this complaint and for a period of time before, Honolulu had notice of  practices and customs of officers and agents of the Honolulu Police Department and City and County of Honolulu, that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper

First Amended Complaint

investigative files, and/or did not disclose investigative or other materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence, including physical evidence; and/or (5) officers pursued wrongful prosecution through profoundly flawed investigations.

189.   These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the County of Riverside and/or the County of San Bernardino directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Plaintiff.

190.   The above practices and customs, so well settled as to constitute *de facto* policies of Honolulu, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

191.   In addition, the misconduct described in this count was undertaken pursuant to Honolulu's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the City and County of

34

First Amended Complaint

Honolulu or were actually committed by persons with such final policymaking authority.

192.    As a consequence, the final policy makers for Honolulu approved of, adopted, and therefore ratified the actions of the Individual Defendants, including their violations of Plaintiff's constitutional rights, making the City and County of Honolulu liable for this misconduct. In fact, on information and belief, rather than taking steps to correct the obvious faults and failures with the investigation, including through training or discipline, the final policy makers for Honolulu further ratified the actions of the Individual Defendants by continuing to employ them, promote them, and approve of their work on the prosecution of Plaintiff that resulted in Plaintiff's wrongful arrest, prosecution, incarceration, and harm.

193.    Plaintiff's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of Honolulu, including but not limited to the Individual Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

### COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress
### Against the Individual Defendants

194.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

195.    The Individual Defendants' actions and conduct as set forth above were intentional, reckless, extreme, and outrageous. The Individual Defendants' actions were rooted in an abuse of power or authority, and were undertaken with intent to

First Amended Complaint

cause, or were in reckless disregard for the probability that they would cause Plaintiff severe emotional distress, as more fully alleged above.

196.   As an actual and proximate result of the Individual Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## COUNT VIII
### State Law Claim – Negligent Infliction of Emotional Distress
### Against the Individual Defendants

197.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

198.   Alternatively, the Individual Defendants' actions and conduct as set forth above were negligent but still extreme, and outrageous. The Individual Defendants' actions were rooted in an abuse of power or authority, and were undertaken negligently and with disregard for the probability that they would cause Plaintiff severe emotional distress, as more fully alleged above.

199.   As an actual and proximate result of the Individual Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## COUNT IX
### State Law Claim – Civil Conspiracy
### Against the Individual Defendants

200.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

201.   As described more fully above, the Individual Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by

First Amended Complaint

concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

202.   In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity.

203.   The violations of Hawaii law described in this complaint, including but not limited to the Individual Defendants' malicious prosecution of Plaintiff and their infliction of emotional distress, were accomplished by Defendants' conspiracy.

204.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

205.   As a result of the Individual Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

## Count X
## State Law Claim — Malicious Prosecution

206.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

207.   The Individual Defendants actions and conduct as set forth above were malicious, as they maliciously initiated proceedings against the Plaintiff without probable cause, resulting in Plaintiff's wrongful detention and prosecution until the charges were ultimately dismissed and the criminal prosecuted terminated in

37

First Amended Complaint

Plaintiff's favor, as more fully alleged above.

208.    As a result of the Individual Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

### Count XI
### State Law Claim —Abuse of Process
### Against the Individual Defendants

209.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

210.    The Individual Defendants' after initiating proceedings against the Plaintiff, continued to commit multiple willful actions for the improper purpose of prosecuting Plaintiff for a crime he did not commit, as more fully alleged above. The Individual Defendants used the courts, including with their authority as law enforcement officers for the City of Honolulu to cause pain and harm to Plaintiff despite his innocence and for an improper purpose.

211.    As a result of the Individual Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

### COUNT XII
### State Law Claim –*Respondeat Superior*
### Against Honolulu

212.    Plaintiff incorporates each paragraph of this complaint as if restated

First Amended Complaint

fully herein.

213.   Plaintiff suffered the aforementioned injuries as a proximate result of the Individual Defendants' misconduct.

214.   During all relevant times, the Individual Defendants were employees and agents of the Honolulu Police Department and the City and County of Honolulu, acting within the scope of their employment or agency.

215.   Defendant Honolulu is liable as principal for all torts committed by its agents.

## COUNT XIII
### State Law Claim –Indemnification
### Against Honolulu

216.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

217.   The City of Honolulu has a duty to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities, which Honolulu does as a matter of established practice.

218.   At all relevant times, the Individual Defendants were employees of the Honolulu Police Department and/or the County and City of Honolulu who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff SEFO FATAI, respectfully requests this Court enter a judgment in his favor and against Defendants CITY AND COUNTY OF HONOLULU, POLICE CHIEF LOUIS KEALOHA, SERGEANT EDGAR NAMOCA, LIEUTENANT MARK KAWASAKI, OFFICER MARK RAMOS; OFFICER

First Amended Complaint

FUMIKAZU MARAOKA, OFFICER JOSHUA NAHULU, OFFICER B. SUGAI, and

JOHN and/or JANE DOES 1-10 , awarding compensatory damages, attorneys' fees

and costs against each defendant, and, because they acted willfully, wantonly, and/or

maliciously, punitive damages against each of the individual defendants, and any

other relief this Court deems just and appropriate, including but not limited to

injunctive and equitable relief against the City of Honolulu.

### JURY DEMAND

Plaintiff SEFO FATAI hereby demands a trial by jury pursuant to Federal

Rule  of Civil Procedure 38(b) on all issues so triable.


DATED: September 14, 2020.

SEFO FATAI


By: /s/ David B. Owens


JENNIFER BROWN, #10885
HAWAI'I CIVIL RIGHTS PROJECT
(808) 554-5576
hawaiicivilrightsproject@gmail.com

DAVID B. OWENS*
LOEVY & LOEVY
100 S. King Street, #100
Seattle, WA 98104
(312) 243-5900
*admitted pro *hac vice*

40

First Amended Complaint