JENNIFER BROWN, #10885
P.O. Box 8415
Honolulu, HI 96830
(808) 554-5576
hawaiicivilrightsproject@gmail.com

DAVID B. OWENS*
LOEVY & LOEVY
100 S. King Street, #100
Seattle, WA 98104
(312) 243-5900
*admitted *pro hac vice*

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF HAWAI'I

| | |
|---|---|
| SEFO FATAI, | ) CIVIL NO. 1:19-cv-603 JMS/WRP |
| | ) |
| Plaintiff, | ) FIRST AMENDED COMPLAINT FOR |
| | ) DAMAGES AND OTHER RELIEF |
| | ) |
| v. | ) JURY TRIAL DEMANDED |
| | ) |
| CITY AND COUNTY OF HONOLULU; | ) |
| SERGEANT EDGAR NAMOCA; | ) |
| OFFICER MARK RAMOS; OFFICER | ) |
| FUMIKAZU MARAOKA, OFFICER | ) |
| JOSHUA NAHULU, OFFICER MARK | ) |
| KEALOHA, and OFFICER BOYCE | ) |
| SUGAI, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

1

## FIRST AMENDED COMPLAINT

Plaintiff, SEFO FATAI, by and through his attorneys, JENNIFER BROWN, and LOEVY & LOEVY, hereby complains against Defendants CITY AND COUNTY OF HONOLULU, SERGEANT EDGAR NAMOCA, OFFICER MARK RAMOS; OFFICER FUMIKAZU MARAOKA, OFFICER JOSHUA NAHULU, OFFICER MARK KEALOHA, and, OFFICER BOYCE SUGAI, and alleges as follows:

## INTRODUCTION

1.      Plaintiff Sefo Fatai was wrongfully arrested, prosecuted, and incarcerated for drug crimes he did not commit. Plaintiff is not a drug dealer and had absolutely no arrests, let alone convictions or other history, related to the criminal drug trade of narcotics. Nonetheless, Plaintiff was arrested and prosecuted for the distribution of methamphetamine due to the misconduct of Honolulu Police Department (HPD) officers, who knew Plaintiff was innocent but prosecuted him anyway.

2.      In so doing, the HPD officers put false and misleading claims into their reports; suppressed evidence of their own misconduct, including in manipulating witnesses; hid the fact they knew Plaintiff was innocent and had manipulated and coerced false witness statements; and secreted the fact they fabricated police reports and warrant applications to deprive Plaintiff of liberty. This heinous ordeal, which began in 2011, did not end until 2018, when the bogus charges were finally dismissed with prejudice.

3.      Through the course of some seven years, three of which he spent

2

Second Amended Complaint

wrongfully in custody, Plaintiff had to fight criminal charges that were not supported by probable cause but, instead, were only made possible due to the fabricated and untrue account created by HPD officers acting pursuant to the policies, practices, and customs of Honolulu.

4.     Though nothing can bring back the time Defendants have taken from Plaintiff, this action seeks to hold accountable the actions of those who arrested, prosecuted, and framed Plaintiff for crimes he did not commit. In addition, this action seeks to deter officers within the City and County of Honolulu, whose policies, practices, and customs were the moving force behind the violation of Plaintiff's constitutional rights.

## PARTIES

5.     Plaintiff SEFO FATAI ("Plaintiff") is and was at all times relevant a resident of the County of Honolulu, State of Hawai'i.

6.     Defendants SERGEANT EDGAR NAMOCA, OFFICER MARK RAMOS, OFFICER FUMIKAZU MURAOKA, OFFICER JOSHUA NAHULU, OFFICER MARK KEALOHA, and OFFICER BOYCE SUGAI, were at all times relevant residents of the City and County of Honolulu, State of Hawai'i, were, at all times relevant, employed as police officers by the City and County of Honolulu; and are sued in their individual capacities for actions taken under color of law and within the scope of employment for the City and County of Honolulu.[1]

---

[1] The individually-named defendants are sued in their personal capacities for actions they took within their scope of employment as members of the Honolulu Police Department for actions taken under the color of law. *See Hafer v. Melo,* 502 U.S. 21

3

Second Amended Complaint

7.       At all times relevant, Defendants RAMOS, MURAOKA, NAHULU, SUGAI, and KEALOHA, were members of the Narcotics/Vice Division of the Honolulu Police Department, assigned to District 8, and, within that District, served as members of the Crime Reduction Unit and/or the Weed and Seed Detail within the District—a small unit that operates in support of uniformed patrol officers, that works largely in plainclothes and that typically performs specific tactical operations and investigations (rather than responding to calls for service).

8.       At all times relevant to the events described in this complaint, Defendant NAMOCA, and was a supervisor within the Honolulu Police Department, assigned to District 8, and directly supervised the District 8 Crime Reduction Unit and the Weed and Seed Detail of which Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha were a part of.  Namoca was responsible for overseeing the prosecution of Plaintiff, and in that capacity he directed, reviewed, approved, and ratified decisions of the other Defendants, including specifically being apprised of the investigation and arrest of Fatai, approving both reports and investigative actions undertaken by the Ramos, Muraoka, Nahulu, Sugai, and Kealoha. As a supervisor actively involved in the work of the District 8 Crime Reduction Unit and Weed and Seed Detail, Defendant Namoca would also attend briefing meetings and even respond to the scene of investigations (including, for example, the arrest of Plaintiff).

9.       Defendant Namoca had knowledge of the investigative steps taken and

_____

(1991) ("Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law.").

Second Amended Complaint

evidence generated by the Ramos, Muraoka, Nahulu, Sugai, and Kealoha.

10.    Collectively, Defendants, Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha are referred to herein as the "Individual Defendants."

11.    Defendant CITY AND COUNTY OF HONOLULU is and was at all times relevant hereto, a duly organized municipal corporation in the City and County of Honolulu, State of Hawai'i. The City and County of Honolulu ("County" or "Honolulu") is or was the employer of the Individual Defendants named above. Honolulu is responsible for indemnifying judgments against the Individual Defendants. In addition, it is liable for all torts the Defendants committed pursuant to the doctrine of respondeat superior. Finally, it is liable for violations of Plaintiff's rights caused by the unconstitutional policies and customs of the City and County of Honolulu, including actions of Individual Defendants undertaken pursuant to those policies and customs during the prosecution of Plaintiff.

## JURISDICTION AND VENUE

12.    The claims asserted present a question of federal law thereby conferring jurisdiction upon this court pursuant to 28 U.S.C. §§ 1331, 1334(3).

13.    This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue is proper under 28 U.S.C. § 1391(b) as, on information and belief, Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district in the State of Hawai'i.

Second Amended Complaint

## FACTUAL ALLEGATIONS

### *Plaintiff Is Innocent*

15.    In 2011, Plaintiff Sefo Fatai worked as a laborer, had stable housing, and was a mechanic by trade.

16.    Plaintiff was not involved in the drug trade whatsoever, but he was nonetheless detained, searched, arrested, and prosecuted for drug crimes he did not commit. This ordeal began in August of 2011, and Plaintiff's first contact with law enforcement was August 24, 2011.

### *The Police Officer Defendants Work Together In the Medford Drug Operation*

17.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha were all members of one of two subunits within the District 8 of the Narcotics Division of the Honolulu Police Department—the Crime Reduction Unit or the Weed and Seed Detail.

18.    In that capacity, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha worked together as part of a small team to conduct specific investigations, including controlled buys.

19.    As it concerns the arrest of Plaintiff, Ramos was "lead case agent," but worked hand-in-hand with Muraoka, Nahulu, Sugai, and Kealoha (and other HPD officers), in the operation.

20.    In that vein, and for example, on August 24, 2011, Defendant Ramos held a "briefing" meeting in the Crime Reduction Unit office of the Kapolei police station, which was attended by Defendants Muraoka, Nahulu, Sugai, and Kealoha  and possibly other officers. In this meeting, these defendants made a plan for how they

6

Second Amended Complaint

would conduct what they called a "controlled narcotics operation," including a discussion of Kristin Medford would be their "informant," a crucial witness for any prosecution.

21.     This investigation is hereinafter referred to as the *Medford Drug Operation*, which was a specific mission instituted by Defendants Ramos and that involved Defendants Muraoka, Nahulu, Kealoha, and Sugai, each of whom participated directly in the *Medford Drug Operation* that led to the eventual arrest and prosecution of Plaintiff.

22.     Supervising Defendant Namoca was either present for the meeting setting up the *Medford Drug Operation* or made aware of its existence, and he assigned particular officers to participate in the operation.

23.     As a result of their meeting, Defendants Muraoka, Nahulu, Kealoha, and Sugai were each given, and understood, their specific roles in the *Medford Drug Operation*.

24.     During the events leading to the arrest of Plaintiff, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha, and other officers, were in coordinated, real-time communication via their portable police radios as well as speaking with one another directly.

25.     During the process of arresting and prosecuting Plaintiff and the *Medford Drug Operation* more generally, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha worked together in generating a number of documents, reports, affidavits, etc., all of which were reflective of the common plan to work together to

7

arrest and prosecute Plaintiff.  These documents frequently refer to the work of one-another as it relates to the factual basis for the prosecution, search, and arrest of Plaintiff. In individual reports concerning the *Medford Drug Operation*, the reports of Defendants Ramos, Muraoka, Nahulu, and Kealoha refer to, and cross-reference, reports written by other defendant officers; *e.g.*, a report written by Defendant Ramos relies upon reports attributed to Defendants Sugai, Muraoka, and Kealoha; documents purportedly authored by Defendant Nahulu refer to reports and information attributed to Defendants Ramos and Kealoha; a report from Defendant Sugai refers to information purportedly gleaned from Defendant Ramos directly; a report attributed to Defendant Kealoha refers to and relies upon Defendant Muraoka's report for "further facts and circumstances"; and Defendant Muraoka's report refers back to information purportedly obtained from Defendant Ramos and purports to describe the activities of other officer defendants.

26.     Defendant Namoca was provided with these documents, which he also signed, approved, and ratified up the chain of command. Defendant Namoca specifically signed nearly every police report produced to Plaintiff to date concerning their actions relative to the *Medford Drug Operation.*

### Defendants Use Threats and Promises To Manufacture An "Informant" To Participate In a Controlled Buy

27.     Unbeknownst to Plaintiff, on or before August 24, 2011, Defendant Ramos had decided to make a "deal" with a woman, Kristine Medford, to attempt to arrest someone for drug trafficking charges.

28.     This plan was formulated after Defendant Ramos pulled Medford over

Second Amended Complaint

and found methamphetamines in her car, within a few days before August 24, 2011.

29.     This was the first time Defendant Ramos had met this woman and the other officer defendants—Muraoka, Nahulu, Sugai, and Kealoha—were not familiar with Medford either.

30.     Upon finding the methamphetamine, Defendant Ramos made Medford a threat—to implicate someone else in the drug trade as a "confidential informant" or face felony prosecution and arrest herself.

31.     Defendant Ramos also made a promise: favorable treatment in the criminal justice system by defendants if she provided assistance to act as an informant.

32.     On August 24, 2011, during their briefing meeting, Defendants Muraoka, Nahulu, Sugai, and Kealoha met with Ramos and agreed to institute this plan, which was further approved by Namoca, In this meeting, Defendant Ramos specifically informed the remaining Defendants of the details of the operation, including his interactions with Medford, her background, the "deal" he concocted (and the means by which he brokered that deal), and how he was going to attempt to use Medford to obtain the arrest of someone else.

33.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew that Medford was likely to be completely unreliable as an informant and buyer, as they had never worked with her before and she had a lengthy criminal history, including other arrests and convictions for crimes relating to drugs and dishonesty.

34.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha also knew

Second Amended Complaint

that Medford was likely using methamphetamines regularly, which they knew negatively impacted her reliability.

35.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew that working with an informant in a drug case requires strict protocol, given that such informants can, and sometimes have, taken money or drugs in what are supposed to be "controlled" buy situations.

36.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha also knew that working with an informant/buyer in a drug case, where the impetus for doing so is avoiding a serious felony charge requires that any action taken pursuant to an agreement to work as an informant be done voluntarily, and without threat.

37.     Nonetheless, with approval from Defendant Namoca, both promises and threats to Medford were made by Defendant Ramos, and, upon information and belief, possibly Defendants Muraoka, Nahulu, and/or Kealoha, to convince her to serve as an informant and participate in a controlled buy.

38.     As part of this, Defendant Ramos, and, upon information and belief, possibly Muraoka, Nahulu, and/or Kealoha, told Medford they wanted her to provide them with access to her drug supplier, not a mere drug "user."

39.     Defendant Ramos, and, possibly Defendants Muraoka, Nahulu, and/or Kealoha, also made threats to Medford about not seeing her children if she did not comply with their wishes.

40.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha were searching for a higher-level drug dealer, and Defendant Ramos, and possibly other

Second Amended Complaint

defendants, pressured Medford to lead them to one, even though the officer defendants knew revealing such information could endanger the life of Medford and/or her children.

41.     Defendant Ramos, and any other defendant officer who made these statements to Medford and/or were present when they were made, described their interactions with Medford to any remaining defendant officers before they implemented their plan. Defendants Ramos, Muraoka, Nahulu, Sugai, or Kealoha, as agents in the *Medford Drug Operation* and who conducted joint briefings, were aware of the tactics employed against Medford, but none of them intervened to stop them or disclosed them after-the-fact.

42.     Being either present for and/or being made aware of the plans relative to the *Medford Drug Operation*, Namoca approved of these acts and the officers' plan.

43.     In light of these threats—including those that would take her from her children—and other promises and incentives, Medford was coerced and/or incentivized to serve as an "informant" and participate in a controlled "buy," whereby defendants would provide Medford with cash to purportedly use to purchase drugs.

44.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha remain unknown to Plaintiff; the officers have not disclosed the full extent of their interactions with Medford, the full extent of their plans concerning Plaintiff, their untruths, fabrications, false or misleading information in documents, or other misconduct in their police reports, other written documents, or during court proceedings related to the prosecution of Plaintiff.

Second Amended Complaint

45.     Medford was unwilling to provide the defendants with the true identity of her drug supplier and was, unsurprisingly, unwilling to set up the person who actually supplied her with methamphetamines.

46.     Instead, on August, 24, 2011, Medford contacted Tanya Waller, whom she owed money.

47.     Waller ran her own business planting seeds and cleaning homes and residential buildings and was not a drug dealer.

48.     Nonetheless, Medford called Waller and asked her to meet her, saying she had the money she owed.

49.     Waller was unavailable and asked Plaintiff to run this errand for her and get the money owed as a debt.

50.     Though they easily had the ability to do so, Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha did not monitor or listen to the phone call between Medford and Waller.

51.     Instead, when Medford arranged to meet with Waller she used her own personal cell phone, which was not being monitored or recorded and had not been "tapped."

52.     Waller told Medford that she was going to send Plaintiff, whom Waller referred to as "Junior" who would be driving a silver Lexus to retrieve what she thought was payment for a debt.

53.     As with the phone call, Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha failed to take established precautions in setting up the purported

12

Second Amended Complaint

controlled buy they had coerced and/or incentivized Medford to participate in.

54.    For example, still on August 24, 2011, pursuant to the plan of Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha established earlier that day, Medford was given $1,900 to complete the purported drug buy by Defendant Ramos and possibly others.

55.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha did not mark or add any special identifiers to the money before it was given to Medford, and Defendant Namoca did not require it of his subordinates, despite the fact they all knew the officers would need to be able to confirm that the money they provided the informant was later recovered by the suspect as the purported seller of the drugs in order for the operation to succeed.

56.    Before Medford was given the unmarked currency, Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha did not conduct a search of Medford to ensure that she did not have any drugs, weapons, or other paraphernalia in her possession.

57.    Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha also permitted Medford to drive her own, private vehicle, which they also did not search.

58.    Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha did not require Medford wear a "wire" or other device that would have recorded the interactions with the purported drug seller.

59.    Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha did not set other parameters for the buy, like requiring it to take place in a location where

Second Amended Complaint

the officers could actually observe any transaction take place.

60.     As she had just days before when Defendant Ramos pulled her over, Medford still had methamphetamines in her possession and in her car.

61.     The meeting place was a Chuck E. Cheese parking lot.

62.     Defendants Muraoka, Nahulu, Sugai, and Kealoha were at or very near the Chuck E. Cheese when the *Medford Drug Operation* was going to take place. Defendants Sugai and Nahulu, for example, were in the parking lot; Defendant Kealoha was inside the restaurant; Defendant Muraoka was nearby waiting for the alleged buyer to drive away (where he would pull that person over); and Defendant Ramos was somewhere nearby but in radio communication with the remainder of the team.

63.     More than an hour transpired between the time when Medford obtained the $1,900 from Defendant Ramos (and possibly others) and meeting Plaintiff.

64.     Prior to August 24, 2011, neither Medford nor Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha had ever spoken to or otherwise interacted with Plaintiff.

65.     Plaintiff has no history, criminal or otherwise, of being a drug user or seller.

66.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha and Medford knew Plaintiff would be driving a silver Lexus.

67.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha had the ability to try to identify Plaintiff from licensing information, which would have

14

Second Amended Complaint

illustrated no history of drug trafficking or the like.

68.     Plaintiff had absolutely no idea that Defendant Ramos and possibly Muraoka, Nahulu, and/or Kealoha, had coerced and/or incentivized Medford to attempt to have him engage in a controlled buy despite his innocence.

69.     Acting pursuant to the plan Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha had created, as approved by Defendant Namoca, and that Medford was convinced her to follow, Medford attempted to conduct a transaction with Plaintiff but did not do so on the sidewalk or in the parking lot.

70.     Instead, and without asking for permission, Medford got inside of Plaintiff's car from the passenger side.

71.     Though at or very near the scene, and in strategic locations near the Chuck E. Cheese, defendants Muraoka, Nahulu, Sugai, and Kealoha were not in a position to actually monitor or listen to the interactions between Plaintiff and Medford inside the car.

72.     Defendants Nahulu and Sugai (in the parking lot) could not see what was happening in the Lexus; Defendant Kealoha (in the restaurant) was unable to see exactly what was happening in the car, as his view was obstructed by the car itself; and none of the officers were able to hear what transpired between Plaintiff and Medford because Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha had not required Medford wear wire, and had failed to set up any other form of audio or visual surveillance.

73.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha failed to take

15

Second Amended Complaint

steps to ensure Medford remained in plain sight (e.g., by instructing her not get in Plaintiff's car or to interact with Plaintiff on the sidewalk or in the parking lot) where what was happening could be seen and possibly heard.

74.    Once she was inside the vehicle, Plaintiff asked Medford for the $100 that he was supposed to be picking up for Waller.

75.    Instead of handing Plaintiff $100, Medford tried to give Plaintiff a small plastic baggie of methamphetamine.

76.    Plaintiff refused to take the drugs, and refused to use the drugs as a substitute for the debt Medford owed Waller.

77.    Defendants Nahulu, Sugai, Kealoha, and possibly other defendants and /or other officers, watched Medford get out of Plaintiff's car, get into her vehicle, and then drive away.

78.    Defendants Nahulu Sugai, Kealoha, and possibly other Defendants and/or other police officers, observed that Medford did not have anything in her hands, and did not see anything indicative of drugs that she had just supposedly purchased from Plaintiff.

79.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha did not follow Medford, did not conduct an immediate search, and did not monitor her movements, even though they had the opportunity to do so.

80.    Instead, before the controlled buy was set to happen, as part of their plan, Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha, established that Defendant Muraoka was going to stop the vehicle driven by the person who

16

Second Amended Complaint

interacted with Medford.

81.     To do so, rather than wearing plainclothes as is typical for Crime Reduction Unit and Weed and Seed Detail officers and investigations, Defendant Muraoka wore his full police uniform and drove a marked police vehicle.

82.     As a further part of this plan formed among Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha, and approved and/or jointly-created with Defendant Namoca, two HPD motorcycle officers and Defendant Muraoka followed Plaintiff as he left the Chuck E. Cheese parking lot.

83.     Upon information and belief, the two motorcycle officers were not part of the District 8 Crime Prevention Unit or the Weed and Seed Detail but, instead, were also fully-uniformed patrol officers who had been assigned to assist in the investigation under the direction of Defendants Namoca, Ramos, and Muraoka.

84.     Using the motorcycle officers to make a purported "traffic stop" with Muraoka was part of the plan created for the *Medford Drug Operation*, led by Defendant Ramos and a joint scheme of Defendants Muraoka, Nahulu, Sugai, and Kealoha that was approved of and/or created by Defendant Namoca.

85.     Plaintiff does not know the names or identities of the motorcycle officers.

### Defendants' First Unlawful Search of Plaintiff Confirmed The "Controlled Buy" Failed and Demonstrated Plaintiff's Innocence

86.     Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew that they needed to recover the $1,900 in order to attempt to implicate Plaintiff in a controlled buy. This was obvious to Defendant Namoca as well.

87.     And, trying to recover the money as soon as possible was especially

Second Amended Complaint

important in this instance because the officers had failed to mark, copy, or otherwise track the Honolulu Police Department money given to Medford.

88.     Pursuant to the plan by they had made, and at the instruction of the Defendants Ramos and Muraoka, the motorcycle officers pulled Plaintiff over.

89.     As memorialized in one of his (fabricated) reports as part of the *Medford Drug Operation* file, Defendant Muraoka falsely claimed Plaintiff was pulled over for failing to make a full stop at a red light when, in fact, Plaintiff was pulled over as part of the plan concocted by Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha before he ever arrived in the parking lot whereby the officers planned would pull over the car of the person who interacted with Medford.

90.     The motorcycle officers did initially indicate why they stopped Plaintiff. Though he had not committed any crime, and as additional evidence of the falsity of Muraoka's claim that Plaintiff was being stopped for some traffic violation, Plaintiff was ordered to get out of his vehicle.

91.     With Defendant Muraoka looking on, the two motorcycle officers thoroughly search Plaintiff's person, including his pockets, socks, and shoes.

92.     These officers then thoroughly searched Plaintiff's automobile including the interior passenger compartment as well as the trunk.

93.     During the search, Defendant Muraoka and the motorcycle officers did not find any drugs in the car or in Plaintiff's possession whatsoever.

94.     During the search, Defendant Muraoka and the officers did not find any money, and did not find the $1,900 in buy money.

18

Second Amended Complaint

95.    Eventually, Plaintiff was released and falsely told he had been stopped for a traffic violation, though he was not given a ticket, and even though this was completely untrue.

96.    Meanwhile, Medford was driving over five miles away from the Chuck E. Cheese to a pre-arranged meeting place, the parking area near a Walmart in Kunia.

97.    Medford was not visually observed or visually monitored by Defendants Ramos, Muraoka, Nahulu, Sugai, or Kealoha as she drove her personal vehicle from Chuck E. Cheese to near a Walmart in Kunia, even though there were ample officers on hand and they knew that ensuring Medford was closely monitored was important.

98.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew that, to have a successful drug buy, they needed to be able to link any drugs from the "buyer" (Medford) to a suspect, which required ensuring that any drugs did not come from any other source, that no drugs were taken, hidden, or ingested by the buyer, or otherwise compromised.

99.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha also knew that they would need to be able to recover any of the $1,900 from Medford that she had not given Plaintiff.

100.   In this circumstance, that was the entire $1,900.

101.   Between the time Medford left the Chuck E. Cheese parking lot, until the time she finally met with the police in Kunia, Medford was afforded significant opportunity to hide or otherwise secret the Department's $1,900 in buy money.

102.   Defendant Ramos and Muraoka claimed to have met with Medford after

19

Second Amended Complaint

Plaintiff refused to take the drugs from Medford (and after she gave him none of the money).

103.    Even though no officer saw Medford exit Plaintiff's vehicle with any package, container, or items in her hand or on her person, Medford turned over a Crystal Light box which contained a clear Ziploc baggie with approximately two ounces of methamphetamines inside, which Medford claimed to have purchased from Plaintiff.

104.    Defendant Muraoka wrote the evidence reports for the baggie of drugs, but did not catalogue the Crystal Light Box. This Crystal Light Box, which would have had exculpatory value for Plaintiff, because it did not bear his fingerprints, was later destroyed.

105.    The statements and reports made and/or written by Defendants Ramos and Muraoka concerning the manner in which the drugs were obtained from Medford contain inconsistencies and contradictions, and they have been untruthful about the manner in which the drugs were obtained from Medford.

106.    Defendants Ramos and Muraoka have failed to provide the truth of their actions as it concerns obtaining the drugs from Medford and, instead, fabricated a story to make it appear as if Medford gave them drugs that had come from Plaintiff, when that was not the case.

107.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew that Medford's claims did not add up.

108.    The officers had also not observed Medford with the Crystal Light box, or

20

Second Amended Complaint

anything remotely resembling it when she walked from Plaintiff's car back to her own.

109.   Indeed, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha were able to confirm that Medford had nothing in her hands due to their contemporaneous communications with one-another, including communications from Defendants Kealoha, Sugai, and Nahulu—who were each tasked with observing the interactions between Medford and Plaintiff.

110.   Nonetheless, even after finding absolutely no buy money or drugs on Plaintiff, when Defendant Ramos and possibly Defendant Muraoka met with Medford after the failed operation, a thorough search of her car or her person was not conducted

111.   Likewise, Medford did not provide the Defendants with any money as change, which they had anticipated (as they expected her to buy much less than $1,900 worth of methamphetamine).

112.   This fact was shared among Defendants Ramos, Muraoka, and Nahulu, communicated to Supervising Defendant Namoca, and possibly communicated to Defendants Kealoha and Sugai as well.

113.   In subsequent documents and statements, Defendants Muraoka, Ramos, and Nahulu fabricated the idea that Plaintiff had provided Medford with an extra ounce of methamphetamine that Medford could pay for later.

114.   At this point, it was obvious that Medford had not engaged in any drug exchange with Plaintiff and that the officers had lost $1,900 in Department money.

115.   Contrary to standard undercover narcotic police practice contained in the

Second Amended Complaint

Honolulu Police Department's Narcotics/Vice Narcotics Operational Plan, as approved by Namoca, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha followed an unwritten practice of ignoring basic routine procedures required for officers dealing with informants in undercover drug investigations.

116.    Such practices include but are not limited to the fact that Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha did not:

     a)  conduct a thorough search of Medford or her car before the purported transaction;

     b)  conduct a thorough search of Medford or her car after the purported transaction;

     c)  require Medford to use a recording device or otherwise utilize any form of audio monitoring, like a wire or microphone;

     d)  require that any interactions between Medford and Plaintiff take place in plain view;

     e)  record the serial numbers on the $1,900 in bills given to Medford or use "marked" money; or

     f)  photocopy or "mark" the $1,900 in bills prior to giving them to Medford.

117.    Additionally, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha allowed Medford to use her personal cell phone and did not monitor or otherwise verify her communications with Waller, Plaintiff, or others (e.g., those who provided her with methamphetamines in the first place).

118.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew Medford

Second Amended Complaint

was unreliable and that she had absconded with the Department's "buy money."

119.   Owing to their ongoing communications, and as members of the *Medford Drug Operation* team, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew they had targeted the wrong person—Plaintiff Sefo Fatai—who was totally innocent. Defendant Namoca, as their heavily-involved supervisor, knew this as well.

### Despite Obvious Evidence of Innocence, Defendants Insist on Falsely Prosecuting Plaintiff

120.   Rather than admitting their mistakes, and that they had lost Department funds and had unlawfully searched and detained a totally innocent person, Defendants Ramos, Muraoka, Nahulu, and Kealoha, with the approval and possible involvement of Defendant Namoca directly, "doubled down" and sought to cover-up their misconduct by insisting on prosecuting Plaintiff.

121.   In particular, despite having absolutely no probable cause, Defendants Ramos, Muraoka, Nahulu and Kealoha sought to further search Plaintiff to secure his arrest, which was done by deliberately putting false and/or misleading information into probable cause affidavits and intentionally omitting information in reports that would have illustrated the absence of probable cause and that Plaintiff was innocent.

122.   As described above, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha authored documents as part of their work in the *Medford Drug Operation* and for the purpose of prosecuting Plaintiff. The purported dates of these reports largely fall on August 24, 2011 and August 26, 2011, but, owing to the fact that many include fabrications and/or misleading information, they include a number of

Second Amended Complaint

inconsistencies as to timing and facts therein.

123.   For example, to get a search warrant on August 24, 201 after the supposed "traffic stop" Defendant Ramos wrote reports and/or affidavits suggesting Medford had approached them implicating Plaintiff, when, in fact, Medford had either been coerced and/or incentivized (through some form of promise or deal) to serve as an informant, even though she did not want to whatsoever. Defendant Ramos specifically wrote the search warrant documentation (which referred to other officers' reports).

124.   In the same vein, and to bolster other deceptions, fabricated reports and/or affidavits purported to have been authored by Defendants Ramos but relied upon by Defendants Nahulu and Muraoka claim Medford had been utilized as an informant on prior investigations for months before the rendezvous involving Plaintiff, when this was false—she had never assisted on any other cases, was coerced into doing so here, and then provided no helpful information but actually took off with the money.

125.   On August 26, 2011, Defendants Ramos conducted another briefing of District 8 Crime Reduction Unit and Weed and Seed Detail officers working on the *Medford Drug Operation*, and specifically its failure a couple of days before.

126.   At this point, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha and Defendant Namoca knew Plaintiff's name; knew that their prior roadside search turned up no contraband; knew that Plaintiff was innocent; and knew that Medford had taken off with the $1,900 in money and provided them with

24

Second Amended Complaint

drugs she did not obtain from Plaintiff.

127.   In this meeting—which is specifically documented in Defendant Nahulu's report—Defendants Ramos, Nahulu, Kealoha, and possibly others, formulated a plan to attempt to "apprehend" Plaintiff for narcotics offenses, and even circulated a photograph of Plaintiff to one-another during this meeting.

128.   As a result of this meeting, upon information and belief, despite knowing Plaintiff was innocent, and having learned so during the first "buy" effort, Defendants Ramos, and possibly others, and with Defendant Namoca's approval, went back to Medford and forced and/or further incentivized her with a deal to again attempt a controlled buy with Plaintiff.

129.   This time, upon information and belief, and despite evidence of Plaintiff's innocence, Medford was required to attempt to implicate "Junior" a second time.

130.   That same day, August 26, 2011, following direct interactions between Medford and Defendant Ramos, and as part of the plan formulated in their briefing, Defendants Ramos, Muraoka, Nahulu and Kealoha proceeded with Medford setting up another meeting using her personal cell phone. Defendants did not monitor the call.

131.   The meeting spot was the Foodland parking lot in Ewa Beach.

132.   Knowing they could not trust Medford with any money (and despite their false claims she was trustworthy in the probable cause affidavits and their fabricated reports), Defendants Ramos, Nahulu, and Kealoha knew they needed to

Second Amended Complaint

attempt to "catch" Plaintiff with drugs or large sums of cash himself if they were going to have any chance of pinning the prior two ounces of methamphetamines Medford gave them on Plaintiff.

133.   But, this plan was obviously fraught: Plaintiff had neither any drugs nor the $1900 in buy money and was merely trying to get the $100 that Medford owed Waller. Plaintiff was also obviously innocent.

134.   This time, when Plaintiff pulled into the parking lot of Foodland and parked his car, Defendants Ramos, Nahulu, and Kealoha, and possibly others, approached Plaintiff's driver's side door and ordered Plaintiff out of the car, guns drawn at him.

135.   Defendant Namoca was also on scene for Plaintiff's arrest.

136.   Though there was no probable cause for so doing, and there was no warrant for his arrest, Plaintiff was arrested.

137.   As he was being arrested and his car was searched, Plaintiff was repeatedly asked "where is the dope" and "where is the money."

138.   Plaintiff honestly responded that he did not have either.

139.   For the second time in a matter of a few days, Plaintiff and Plaintiff's car were thoroughly searched. Again, no buy money, drugs, or contraband was found on Plaintiff or in Plaintiff's car.

140.   Plaintiff was obviously innocent and there was no reliable evidence to suggest he was involved in trafficking methamphetamines, a fact that this "surprise" search of Plaintiff and his car yet again confirmed.

Second Amended Complaint

141.     Defendants Namoca, Ramos, Nahulu, Kealoha, and possibly others, were on scene when Plaintiff was arrested, and each of the were aware—pursuant to their plan, the collective scheme of the *Medford Drug Operation* and specifically discussed in at least their "briefing meeting"—Plaintiff was going to be falsely arrested that day even though they lacked probable cause for so doing.

142.     Each of the defendants on the scene—Defendants Namoca, Ramos, Nahulu, Kealoha, and possibly others—did nothing to intervene or stop the arrest of Plaintiff; a fact unsurprising since this was part and parcel of their plan in the *Medford Drug Operation*, which had been approved of by Defendant Namoca from day-one.

143.     Plaintiff was transported to the police station by Defendant Kealoha.

144.     Upon arrival at the station, Lt. Mark Kawasaki, another higher-ranking supervisor, was apprised of Plaintiff's arrest, and the circumstances of it (including that Defendants Ramos, Muraoka, Nahulu and Kealoha had not obtained any evidence or contraband despite two searches), but nonetheless approved of the warrantless arrest of Plaintiff.

145.     Though there was no probable cause, Defendant Nahulu also wrote an affidavit in support of a warrantless arrest of Plaintiff on August 26, 2011, which included facts fabricated in other reports, including those purportedly authored by Defendants Ramos and Muraoka.

146.     As with the search warrant, the arrest warrant affidavit omitted the fact Medford had been coerced and/or incentivized to participate and that Plaintiff

27

Second Amended Complaint

was searched immediately after the purported transaction but had no drugs or buy money whatsoever.

147.   Defendants Ramos, Muraoka, and Nahulu repeated lies, omissions, and misrepresentations from their probable cause affidavits in police reports from the *Medford Drug Operation* about the investigation of Plaintiff.

148.   Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha never disclosed to Plaintiff or his defense attorneys or even prosecutors the entirety of their tactics with Medford, the types of promises they made to her, or the fact there were lies and material misrepresentations in in affidavits and police reports.

149.   Had Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha revealed their lies (in their police reports and probable cause affidavits) and misconduct (particularly in how they coerced and/or incentivized Medford), Plaintiff never would have been charged with a crime.

150.   Instead, in fabricating evidence—including written reports, and the manipulation of Medford—Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha, with the involvement and supervision of Defendant Namoca, built a false case around Plaintiff, despite his obvious innocence.

151.   Defendants Ramos, Nahulu, and Kealoha are all named on the August 26, 2011 arrest report documenting Plaintiff's wrongful and warrantless arrest as part of the *Medford Drug Operation*.

152.   In addition to verbal approval, Defendant Kawasaki also signed the arrest report of Plaintiff for drug crimes he did not commit.

Second Amended Complaint

153.    To this day, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha have failed to admit the extent of their own misconduct and the entire scope of the actions they took (including in fabricating evidence, in putting false or misleading information in affidavits, and in manipulating Medford) to falsely implicate Plaintiff.

154.    Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha —via their reports, their interactions with Plaintiff, their interactions with Medford, and as a result of the briefing meetings that involved all of them—failed to disclose their own misconduct and other material evidence that, had it been known, would have led to the criminal prosecution of Plaintiff to have either never began or, if later disclosed, quickly dismissed.

155.    Because they were part and parcel of the practices of the Honolulu Police Department and Honolulu, Defendant Namoca approved the acts, omissions, and conduct of the other defendants. When those actions were reported further up the chain, for example to Lt. Mark Kawasaki, the actions of Ramos, Muraoka, Nahulu, Sugai, and Kealoha were further approved and adopted as consistent with and pursuant to the customs and policies of Honolulu.

156.    These actions—and the prosecution of Plaintiff—were approved of as consistent with the policies and practices of the department, despite the fact Indeed, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha's actions contradicted accepted practices for policing and despite the fact they were even inconsistent with the written HPD policies.

Second Amended Complaint

157.   Despite knowing that Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha had not followed the written policy for informant controlled buys but acted according to unlawful practices of Honolulu, Defendant Namoca authorized, approved of, and endorsed the false and flawed investigation reports and documents, which were used to further the prosecution of Plaintiff.

158.   The approval of these acts, both by Namoca and Kawasaki and up the chain of command, reflect an indifference to the harm caused by not following these practices, including the wrongful arrest, prosecution, incarceration, and possible conviction of an innocent person, like Plaintiff.

159.   Upon arresting Plaintiff on August 26, 211, the defendants—including specifically Defendants Nahulu, Ramos, and Kealoha—illegally seized Plaintiff's automobile, a 1999 Lexus, without probable cause and subjected his car to "forfeiture" as a result of alleged drug dealing, even though that was untrue and there was no lawful basis of justification for so doing.

160.   To support this "forfeiture," again with reports that reference the work of one another, Defendants Ramos, Nahulu, and Kealoha repeated the lies they put in other documents, including their warrant affidavits and police reports, falsely implicating Plaintiff, omitting their misconduct, and mischaracterizing the result of their work that illustrated Plaintiffs' innocence.

161.   Both Defendants Ramos and Kealoha wrote reports specifically supporting the forfeiture of Plaintiff's vehicle, which was part of the plan and scheme shared among Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha to prosecute

30

Second Amended Complaint

Plaintiff unlawfully.

162.    Defendant Ramos authored the formal notice of seizure for forfeiture which was then referred to other HPD officers in the "forfeiture detail" who processed the forfeiture pursuant to the City's practices and customs. Based upon the fabricated and misleading reports written by the officers, including facts purporting to implicate Plaintiff in narcotics trafficking though he was innocent, and a finding that the car was property used in the commission of, or attempt to commit, drug offense, Plaintiff's car was taken from him and deemed "forfeited."

### *Criminal Proceedings Against Plaintiff*

163.    Based upon the false, misleading, and fabricated evidence and warrant applications, and despite his innocence, Plaintiff was indicted for a serious felony—methamphetamine trafficking.

164.    Between 2011 and 2018 Plaintiff was subject to criminal prosecution for drug trafficking crimes he did not commit. During this time, Plaintiff was deprived of his liberty, including for several days before he could post bond, by facing restrictions on his movement and activities while on bond (including at some point a curfew and having to attend numerous court proceedings or risk further prosecution), and later by being held at the Oahu Community Correctional Center for roughly three years when he was placed in custody.

165.    These deprivations of Plaintiff's liberty, and harms from the bogus prosecution itself, were caused by the misconduct of Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha and the *Medford Drug Operation* that failed

Second Amended Complaint

and led to the prosecution of an innocent man, including their generation of fabricated evidence, writing false and misleading probable cause affidavits, and their manipulation of Medford both before and after Plaintiff was arrested. But for the Defendants' fabrications, Plaintiff would have never been arrested, prosecuted, subject to bond (and its restrictions), or held in the county jail for years.

166.   The reports authored by Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha, and signed off by Defendant Namoca, were part of the prosecution's file and contributed to, enabled, and caused, the prosecution of Plaintiff, which would not have been possible absent the misconduct of Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha.

167.   Defendants Ramos, Nahulu, Sugai, Kealoha, Muraoka were named as State witnesses during the course of the prosecution. And, each one of them testified against Plaintiff during the course of his criminal prosecution, but where they still suppressed their own misconduct and other exculpatory evidence.

168.   Had Defendants Ramos, Nahulu, Sugai, Kealoha, Muraoka disclosed material and exculpatory evidence—including their own misconduct, the manipulation of Medford, that their reports included fabrications (and an attempt to cover up their loss of the buy money)—Plaintiff, who was innocent, would not have been subject to arrest and years of detention in county jail. Defendants refused to disclose such material evidence even when the prosecution went to trial four times, two of which involved substantive testimony, in one or both of the trials, Defendants Ramos, Nahulu, Sugai, Kealoha, Muraoka. Had this material information been disclosed,

32

Plaintiff would have been freed of confinement and the strains of prosecution and not forced to sit through trial, years prior. In the alternative, had Defendants Ramos, Nahulu, Sugai, Kealoha, Muraoka disclosed material and exculpatory evidence, Plaintiff would have been acquitted at trial, rather than enduring two mistrials, ending the criminal prosecution at that point.

169.    Instead, unaware of the exculpatory information, prosecutors proceeded with the cause against Plaintiff.

170.    During the prosecution, after he had been held in the jail for some time, Plaintiff was offered a plea for credit for time served and probation. Being innocent, Plaintiff refused to plead guilty to something he did not do, and so the criminal prosecution, based upon the actions of Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha, and as approved of by Defendant Namoca, continued.

171.    Upon information and belief, even after Plaintiff's arrest and the charges against him, Medford was also offered additional deals in exchange for testifying against Plaintiff, including mere probation in 2014 following an arrest for an additional methamphetamine-related offense. The terms of these deals were never provided to Plaintiff or his criminal defense attorney, even as the case proceeded to trial several times.

172.    Had Defendants disclosed their own misconduct, the deals they offered to Medford, and that they knowingly prosecuted an innocent man, Plaintiff would have never been arrested let alone prosecuted or made to stand trial four times for crimes he did not commit.

33

Second Amended Complaint

173.   After Medford did not appear for Plaintiff's fourth criminal trial, the bogus drug charges—the result of the misconduct of the Defendants—were finally dismissed with prejudice in January 2018.

174.   Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha were aware that of the collective agreement to prosecute Plaintiff where they agreed to write fabricated reports; to hide exculpatory evidence of Plaintiff's innocence (including through their own reports); to provide false and/or misleading information in affidavits; and to coerce and/or incentivize Medford, all in violation of the constitution.

175.   During the entire course of the *Medford Drug Operation*, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha had many opportunities to intervene and stop one-another from falsely prosecuting Plaintiff, including their briefing meetings on August 24 and August 26, 2011, in drafting their reports (which reference the reports of one-another), in coming clean about their misconduct once the indictment was obtained, or before or during the trials Plaintiff endured. Nonetheless, though they had the opportunity to do so, none of the defendants Ramos, Muraoka, Nahulu, Sugai, Kealoha or Namoca intervened to prevent the violation of Plaintiffs constitutional rights as described herein.

176.   Each Defendant elected not to intervene or disclose these acts but, instead, chose to continue with the scheme they had agreed upon in their multiple briefing meetings, including most significantly on August 24, 2011 and August 26, 2011, the latter of which they explicitly formulated a plan to "apprehend" Plaintiff after the August 24, 2011 "controlled buy" left them empty handed.

Second Amended Complaint

### Honolulu's Policies, Practices, and Customs

177.   As a matter of practice, Honolulu permits officers to present false evidence in support of criminal charges that should never have been brought.

178.   For example, in July 2013, the former Honolulu Chief of Police, with other undercover officers filed false reports resulting in an innocent man, Gerard Puana, being charged with a federal crime for allegedly stealing the Chief's mailbox. On June 27, 2019, the former Chief of Police, and other Honolulu Police Department officers were found guilty of conspiracy and obstruction of justice in that case.

179.   Upon information and belief, the prosecution of Plaintiff falls into a similar practice of what happened to in Puana's case, and is reflective of long standing unwritten customs in the Department.

180.   The actions of Ramos, Muraoka, Nahulu, Sugai, and Kealoha were reported up the chain of command, whereby the City has approved of their acts, including the specific approval and extensive involvement of Defendant Namoca and the approval of a further supervisor, Lieutenant Mark Kawasaki.

181.   Approval of the Defendants Ramos, Muraoka, Kealoha, Nahulu, and Sugai's actions up the chain of command constituted formal approval by the Honolulu Police Department, as approved by City itself and/or its official policymaker related to the policies and practices of the HPD.

182.   After the charges were dismissed, a Deputy Chief for the Honolulu Police Department, John McCarthy, specifically stated that he believed the actions of the police officers concerning the *Medford Drug Operation* acted accordance to the policies

35

Second Amended Complaint

and practices of the Department and had not violated Plaintiff's constitutional rights.

183.   As a result, Honolulu, including through the actions of Namoca, Kawasaki, and the Deputy Chief McCarthy, has approved and ratified the conduct of Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha here, including the decisions to put false and misleading information in warrant applications, in police reports, in coercing and manipulating witnesses, and in failing to disclose exculpatory evidence (including officers' own misconduct as well as "deals" made in exchange for false inculpatory testimony), the practice of causing mistrials to apply pressure to innocent defendants to accept false pleas, and in seeking prosecution of people without probable cause.

184.   Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha, as well as supervisor Namoca, were acting pursuant to the policies, practices, and customs of the Honolulu Police Department and as such the misconduct in this case itself illustrates what the real "unspoken" or "unwritten" practices of the Department were on-the-ground. Otherwise, the Defendants would not have been able to collectively work to engage in these acts, and they would not have been so approved by their supervisors.

185.   As reflected in its written policies, and those pertaining to narcotics operations specifically and care in using informants, Honolulu is aware of the importance of following strict guidelines when it comes to conducting controlled buys for narcotics. Honolulu is aware that failure to abide by these protocols can lead to evidence destruction, the violation of constitutional rights of the accused, and risk that innocent people, like Plaintiff, would be prosecuted for crimes they did not commit

Second Amended Complaint

(and in violation of their constitutional rights).

186.   Nonetheless, despite being aware of the risks of wrongful prosecutions and constitutional violations, Honolulu failed to adequately train, supervise, and/or discipline Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha. Had they been properly trained, supervised, and/or disciplined Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha would not have violated Plaintiff's constitutional rights, they would have been stopped along the way, and/or they would have been disciplined for their acts.

187.   Instead, Defendants Ramos, Muraoka, Nahulu, Sugai, Kealoha, and Namoca were able to violate Plaintiff's constitutional rights; they were not stopped by their supervisors (who approved their acts at every steps); and they have received absolutely no discipline for their actions concerning Plaintiff and other obvious failures in the *Medford Drug Operation*.

188.   Moreover, while Honolulu had some written policies (which the Defendants did not follow), there are gaps in policies an inadequate procedural safeguards to ensure that what happened to Plaintiff would not happen to others.

189.   The need for adequate training, supervision, discipline, and procedural safeguards in the area of controlled buys for narcotics operations, the writing of search and arrest warrants, and in ensuring that unreliable, unconstitutional evidence is generated was obvious and known to Honolulu by 2011. Indeed, in 2011 alone, the Narcotics/Vice Division of the Honolulu Police Department conducted investigations that resulted in the seizure of over 65 pounds of methamphetamine, 16 pounds of

Second Amended Complaint

cocaine, and other drugs with a street value the City estimated to be worth $27 million. In 2011, Honolulu conducted over 1,000 arrests related to enforcement of its drug laws. Given the frequency with which arrests are made concerning drug operations, and the significant amount of drugs recovered on the island, Honolulu was keenly aware of the need for proper training, supervision, discipline, and implementation of sufficient procedural safeguards concerning drug operations, like the *Medford Drug Operation*, to ensure they do not involve wrongful prosecutions or the violation of people's constitutional rights. Yet, owing to its indifference to these obvious consequences from inadequate policies and practices, Honolulu failed to implement sufficient training, supervision, discipline, or procedural safeguards.

190.   The absence of adequate training, supervision, discipline, and procedural safeguards, particularly combined with the unwritten customs and practices of the department that include the misconduct here, was the moving force behind the violation of Plaintiff's constitutional rights.

191.   Separately, under Hawaiʻi Revised Statute § 712A, the Honolulu Police Department has a large financial stake in forfeiture. The Honolulu Police Department receives 25% of forfeiture proceeds, with 25% going to the prosecuting attorneys, and 50% going to the Attorney General for the State of Hawaiʻi.

192.   The Honolulu Police Department has a policy and practice of using Hawaiʻi Revised Statute § 712A as a way to generate profit and seize property from citizens without probable cause or reasonable suspicion of illegal activity, in violation of the Fourth Amendment of the Constitution of the United States.

38

Second Amended Complaint

193.   From 2001 to 2014, the Honolulu Police Department accounted for 46.5% of the asset forfeitures in the entire state of Hawai'i, more than any other police department or state agency.

194.   Many citizens, such as Plaintiff, cannot afford to pay either the required up front bond of $2,500 or 10% of the estimated value of the property seized, therefore allowing the Honolulu Police Department to take from the poor without any oversight to ensure that the process is fair.

195.   Plaintiff's vehicle was taken by Defendants and "forfeited," without probable cause; and, "forfeited" even though he is innocent of the charges and never convicted. Using Hawai'i Revised Statute § 712A in the manner done by the Individual Defendants is unlawful and done to enrich the City for profit and ill-gotten gains it should have never had and, should return at any rate.

196.   Nonetheless, Defendants have refused to return Plaintiff's "forfeited" items, including his car. Because Defendants use the forfeiture statute for profit, they have no mechanisms for innocent citizens, like Plaintiff, to obtain their seized property, even when the person is innocent and the criminal charges have been dismissed.

197.   Instead, it is the practice and custom of the City, which Defendants invoked here, to refuse to return seized items, even if seized unlawfully and even following the completion of a criminal case that is later dismissed.

### *Plaintiff's Damages*

198.   Plaintiff suffered for over seven years fighting the bogus charges and

Second Amended Complaint

prosecution that were perpetrated against him by the Defendants and pursuant to the practices of Honolulu.

199.    Nearly three of those years Plaintiff suffered in custody, where he was faced with terrible conditions due to over-crowding at the Oahu Community Correctional Center, including sleeping on the floor near toilets, violence and the threat of violence from other inmates, and the restraint upon his liberty. While detained, Plaintiff was deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

200.    As a result of these charges, Plaintiff's life was truly upended. In addition to causing Plaintiff the severe trauma of wrongful imprisonment and the stress of charges hanging over his head for years while out on bond, loss of his liberty, actual physical harm and pain, and reputational harm, the Defendants' misconduct continues to cause Plaintiff physical and psychological pain and suffering, humiliation, fear, nightmares, anxiety, depression, and despair, rage, and other physical and psychological effects and he has suffered emotional harm and great anguish, which continues to this day.

### Defendants Were Likely Aware Of This Suit Soon After It Commenced

201.    Given the case went to trial four separate times, requiring the Police Officer Defendants to be available to testify, and the State having presented substantive testimony from each of these officers in at least one of two of the trials, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha were aware of the ongoing

Second Amended Complaint

progress of the prosecution. As their supervisor, Defendant Namoca was aware of the progress as well.

202.   As state's witnesses, and being part of a small close-knit team of officers who attempted to frame Plaintiff for crimes he did not commit, Defendants Ramos, Muraoka, Nahulu, Sugai, and Kealoha also learned that in the charges against Plaintiff were finally dismissed with prejudice in January 2018. Upon information and belief, Defendant Namoca was also made aware of this fact.

203.   Given their misconduct, Defendants Namoca, Ramos, Muraoka, Nahulu, Sugai, and Kealoha knew, or should have known, that Plaintiff was likely going to sue each one of them—as members of the *Medford Drug Operation* and officers who were part of the subsequent prosecution of Plaintiff for over seven years—to seek redress for his injuries.

204.   Indeed, after the charges were finally dismissed, media reported on the prosecution of Plaintiff, including placing emphasis on the actions of the police officers and their testimony and reports concerning Plaintiff.

205.   In media that implicated the entire team of officers involved in the *Medford Drug Operation*, media reported that a lawsuit was forthcoming. For example, on December 4, 2019, Honolulu Civil Beat, published an extensive and lengthy article *Case Dismissed: 8 Years, No Conviction and A Honolulu Man's Life Derailed*, which detailed problems with the prosecution of Plaintiff for the drug crimes and specifically indicated that Fatai planned to file a lawsuit concerning his prosecution.

Second Amended Complaint

206.   This lawsuit was filed on December 17, 2019. Two days later, the Honolulu Civil Beat, reported on the filing of the lawsuit, in an article entitled *Honolulu Man Tried Repeatedly on Meth Charges Files Civil Rights Suit*, which reported that both Honolulu and the Honolulu Police Department were aware of the suit, but that they would not comment on the pending litigation. This story was posted not only on Honolulu Civil Beat's website, but also their Facebook account, as well as reproduced in other social media, like Twitter.

207.   As such, very soon after this suit was filed, corporation counsel for Honolulu certainly was aware of the original lawsuit and that it implicated the entire *Medford Drug Operation*, particularly given the names of Officers Namoca, Nahulu, Sugai, and Kealoha were part of the police reports in the case.[2] As members of the Honolulu Police Department, Defendants Namoca, Nahulu, Sugai, and Kealoha knew any lawsuit filed against them for acts taken within the scope of their employment would be eligible for representation via the City's corporation counsel, who would represent them.

208.   All individually-named defendants—including Defendants Namoca, Nahulu, Sugai, and Kealoha—were implicated in the misconduct alleged in the original complaint, given their reports involve frequent references to the reports of one another and because the complaint called into question the *Medford Drug Operation*, of which each of the individually-named defendants was a part of, had awareness of,

---

[2] Honolulu has not produced all of the police reports for the *Medford Drug Operation* to Plaintiff in this civil case, even in its initial disclosures, and has refused to answer initial discovery as well.

Second Amended Complaint

and worked on hand-in-hand with Defendants Ramos and Muraoka.

209.    Upon information and belief, Defendants Namoca, Kealoha, Nahulu, and Sugai were likely personally or constructively aware of this lawsuit within 90 days of its commencement, given that it implicated their own efforts as part of the *Medford Drug Operation*, they worked as a part of a small detail of officers that conducted covert operations with one another (and were not part of a large team of "patrol" officers), it called into question the actions of their own conduct, they have or are likely to have common counsel, there was media coverage, described above; and due to any possible personal relationships with Defendants Ramos and Muraoka who were

## COUNT I

### 42 U.S.C. § 1983 – Illegal Detention and Prosecution
### Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai [3]

---

[3] This Count states a claim under the Fourth Amendment, which encompasses what is sometimes referred to as federal "malicious prosecution" and a claim of seizure in the absence of probable cause. These Fourth Amendment claims focus on the whether there was probable cause to support a detention or if it was corrupted by fabricated evidence for example, or *e.g.*, *Manuel v. City of Joliet*, 137 S. Ct. 911, 918-20, & n.8 (2017) ("The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause."); *Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002) (recognizing Fourth Amendment "malicious prosecution" claim*); Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (similar and denoting absence of probable cause for criminal proceedings initiated on the bases of intentional and knowingly false accusations), or focus on whether the warrant applications or other evidence used to initiate the criminal proceedings violate the Fourth Amendment under *Franks v. Delaware*, 438 U.S. 154 (1978), and it progeny. Such Fourth Amendment theories have different elements and standards of proof than Due Process claims, even if the type of misconduct is similar, under *Brady v. Maryland*, 373 U.S. 83 (1963), *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc), and *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014), which have their own elements and standards themselves. Because a "plaintiff is generally entitled to plead alternative or multiple theories of recovery on the basis of the same conduct on the part of the defendant," *MB Fin. Grp., Inc. v. U.S. Postal Serv.*, 545 F.3d 814, 819 (9th Cir. 2008) (citing FED. R. CIV. P. 8(d)(2) ("A party may set out [two] or more

43

210.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

211.    In the manner described more fully above, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

212.    In so doing, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai caused Plaintiff to be deprived of his liberty and detained without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. Plaintiff was deprived of his liberty, after the issuance of process based upon Defendants false and/or misleading affidavits and statements both while awaiting trial while on bond and, later, when he was jailed for more than three years.

213.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally. In the alternative, the misconduct described in this count was also undertaken with malice.

---

statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."), *see Flores-Haro v. Slade,* No. 3:12-CV-01616-MO, 2018 WL 4931991, at *4 (D. Or. Oct. 11, 2018) ("A jury may award damages for the same conduct on different legal theories when multiple injuries are alleged."), and because a complaint need not parse legal theories, *Sagana v. Tenorio,* 384 F.3d 731, 736-37 (9th Cir. 2004), this Count should not be dismissed as "redundant."

Second Amended Complaint

214.   As a result of Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

215.   Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

## COUNT II
### 42 U.S.C. § 1983 —Illegal Seizure
**Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai**

216.    Plaintiff incorporates each paragraph of this complaint as if fully stated herein.

217.   In the manner described more fully above, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai, while acting individually,  jointly, and/or in conspiracy with each other, as well as under color of law and within the scope  of their employment, deprived Plaintiff of his Fourth Amendment constitutional right to his own property when, without probable cause, they unlawfully used asset forfeiture to seize items belonging to Plaintiff and never return them, even after all of the charges against Plaintiff have been dismissed.

218.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear innocence.

219.   As a result of the Defendants' misconduct described in this count,

Second Amended Complaint

Plaintiff suffered loss of property and money, and suffered mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

220.   Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

## COUNT III
### 42 U.S.C. § 1983 – Violations of the Fourteenth Amendment, Due Process Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai

221.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

222.   As described, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai, while acting individually, jointly, and/or in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and his right to a fair trial.

223.   In the manner described more fully above, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution,  including: evidence of coercion and threats made to manipulate witnesses to falsely implicate Plaintiff despite knowing he was innocent; evidence of deals and promises made to incentivize false inculpatory testimony against Plaintiff; their own misconduct in coercing and fabricating evidence and testimony; and that they had fabricated police reports and

46

Second Amended Complaint

warrant affidavits.

224.    Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai knew there was no credible evidence tying Plaintiff to drug trafficking of methamphetamine. Had they disclosed this exculpatory evidence, the evidence would have proved Plaintiff's innocence, cast doubt on the entire police investigation and prosecution, and led to the end of Plaintiff's detention and prosecution.

225.    In addition, on information and belief, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai concealed and fabricated additional evidence that is not yet known to Plaintiff.

226.    In addition, as described more fully above, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, fabricated and solicited false evidence, including witness statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, obtained charges against Plaintiff, forced Plaintiff to endure four criminal trials and spend years imprisoned in jail based upon that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal prosecution, including at his trials. In fabricating evidence, Defendants Ramos, and possibly others, used coercive and improper tactics he knew were likely to lead to the generation of false and unreliable evidence, and Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai relied upon such evidence despite knowing Plaintiff was innocent.

227.    Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai performed the above-described acts under color of state law, deliberately,

Second Amended Complaint

intentionally, with malice or reckless disregard for the truth and Plaintiff's rights and with deliberate indifference to Plaintiff's clearly established constitutional rights.

228.   As a result of Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

229.   Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

<u>**COUNT IV**</u>
**42 U.S.C. § 1983 – Failure to Intervene**
**Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai**

230.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

231.   In the manner described above, during the constitutional violations described above, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

232.   Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai had a duty and reasonable opportunity to prevent this harm to Plaintiff, but they failed to do so.

233.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional

Second Amended Complaint

rights.

234.    As a result of Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

235.    Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

## COUNT V
### 42 U.S.C. § 1983 – Conspiracy
### Against the Police Officer Defendants

236.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

237.    Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai reached an agreement among themselves to frame Plaintiff for drug trafficking crimes he did not commit, and thereby to deprive Plaintiff of his constitutional rights, as described above. This agreement was first reached before arresting Plaintiff, and it remained in place throughout all periods of his wrongful detention, prosecution, and incarceration.

238.    In addition, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai conspired before Plaintiff's arrest, and continued to conspire after he was charged and through various phases of his criminal prosecution to deprive Plaintiff of

49

exculpatory material to which he is entitled and that would have led to his earlier exoneration.

239.   In this manner, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai, acting in concert with each other and with other co-conspirators, known and unknown, conspired by concerted action to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

240.   In furtherance of the conspiracy, each co-conspirator committed overt acts and was an otherwise willful participant in joint activity.

241.   As a result of this illicit prior agreement, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

242.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

243.   Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count was undertaken pursuant to Honolulu's policies and practices, which are more fully described below.

### COUNT VI
**42 U.S.C. § 1983 – Policy & Custom Claims**
**Against Honolulu**

244.   Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

245.   Plaintiff's injuries described in this complaint and the violations of his

Second Amended Complaint

constitutional rights discussed above were caused by the policies and customs of Honolulu, as well as by the actions of policy-making officials for Honolulu.

246.   At all times relevant to the events described in this complaint and for a period of time before and after, Honolulu failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of officers in using informants, setting up "controlled buys," the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

247.   In addition or alternatively, Honolulu failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the Honolulu Police Department, with respect to using informants, setting up "controlled buys," techniques to be used when questioning criminal suspects and witnesses; the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

248.   Honolulu has also adopted unwritten practices, despite its written

51

Second Amended Complaint

policies, that allow officers to using informants, setting up "controlled buys," produce false and misleading documents, and otherwise target investigations at innocent people, as described above, making its written guidance entirely ineffective.

249.   Officers and agents of Honolulu committed these failures to promulgate proper or adequate rules, regulations, policies, and procedures and the adoption of unwritten practices "off the books." Had Honolulu promulgated and enforced appropriate policies and practices, then the violation of Plaintiff's constitutional rights would have been prevented.

250.   In addition, at all times relevant to the events described in this complaint and for a period of time before, Honolulu had notice of a practice and custom by officers and agents of the Honolulu Police Department and City and County of Honolulu pursuant to which individuals suspected of criminal activity, like Plaintiff, were falsely implicated in crimes they did not commit through the use of unreliable informants and other people actually involved in drug trafficking.

251.   In addition, at all times relevant to the events described in this complaint and for a period of time before, Honolulu had notice of  practices and customs of officers and agents of the Honolulu Police Department and City and County of Honolulu, that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative or other materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence implicating criminal defendants in

Second Amended Complaint

criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence, including physical evidence; and/or (5) officers pursued wrongful prosecution through profoundly flawed investigations.

252.    These practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the County of Riverside and/or the County of San Bernardino directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those affecting Plaintiff.

253.    The above practices and customs, so well settled as to constitute *de facto* policies of Honolulu, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

254.    In addition, the misconduct described in this count was undertaken pursuant to Honolulu's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge, approval, or endorsement of persons with final policymaking authority for the City and County of Honolulu or were actually committed by persons with such final policymaking authority.

255.    As a consequence, the final policy makers for Honolulu approved of,

Second Amended Complaint

adopted, and therefore ratified the actions of the Individual Defendants, including their violations of Plaintiff's constitutional rights, making Honolulu liable for this misconduct. In fact, on information and belief, rather than taking steps to correct the obvious faults and failures with the investigation, including through training or discipline, the final policy makers for Honolulu further ratified the actions of the Individual Defendants by continuing to employ them, promote them, and approve of their work on the prosecution of Plaintiff that resulted in Plaintiff's wrongful arrest, prosecution, incarceration, and harm.

256.   Plaintiff's injuries and the constitutional violations he suffered were caused by officers, agents, and employees of Honolulu, including but not limited to the Individual Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this count.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress
### Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai

257.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

258.   Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's actions and conduct as set forth above were intentional, reckless, extreme, and outrageous. Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's actions were rooted in an abuse of power or authority, and were undertaken with intent to cause, or were in reckless disregard for the probability that they would cause Plaintiff severe emotional distress, as more fully alleged above.

54

Second Amended Complaint

259.   As an actual and proximate result of Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's actions, Plaintiff suffered and continues to suffer severe emotional distress.

## COUNT VIII
### State Law Claim – Negligent Infliction of Emotional Distress
### Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai

260.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

261.   Alternatively, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's actions and conduct as set forth above were negligent but still extreme, and outrageous. Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's actions were rooted in an abuse of power or authority, and were undertaken negligently and with disregard for the probability that they would cause Plaintiff severe emotional distress, as more fully alleged above.

262.   As an actual and proximate result of the Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's actions, Plaintiff suffered and continues to suffer severe emotional distress.

## COUNT IX
### State Law Claim – Civil Conspiracy
### Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai

263.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

264.   As described more fully above, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai, acting in concert with other co-conspirators, known and

Second Amended Complaint

unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of his rights.

265.   In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was otherwise a willful participant in joint activity.

266.   The violations of Hawaii law described in this complaint, including but not limited to the Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's malicious prosecution of Plaintiff and their infliction of emotional distress, were accomplished by Defendants' conspiracy.

267.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with willful indifference to Plaintiff's constitutional rights.

268.   As a result of Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

## COUNT X
### State Law Claim — Malicious Prosecution
### Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai

269.   Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

270.   Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's

56

Second Amended Complaint

actions and conduct as set forth above were malicious, as they maliciously initiated proceedings against the Plaintiff without probable cause, resulting in Plaintiff's wrongful detention and prosecution until the charges were ultimately dismissed and the criminal prosecuted terminated in Plaintiff's favor, as more fully alleged above.

271.    As a result of the Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

<u>**COUNT XI**</u>
**State Law Claim —Abuse of Process**
**Against Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai**

272.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

273.    After initiating proceedings against the Plaintiff, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai continued to commit multiple willful actions for the improper purpose of prosecuting Plaintiff for a crime he did not commit, as more fully alleged above. Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai used the courts, including with their authority as law enforcement officers for the City of Honolulu to cause pain and harm to Plaintiff despite his innocence and for an improper purpose.

274.    As a result of Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai's misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering,

57

Second Amended Complaint

and other grievous and continuing injuries and damages.

## COUNT XII
### State Law Claim –*Respondeat Superior*
### Against Honolulu

275.    Plaintiff incorporates each paragraph of this complaint as if restated fully herein.

276.    Plaintiff suffered the aforementioned injuries as a proximate result of the misconduct of Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai.

277.    During all relevant times, Defendants Namoca, Ramos, Muraoka, Kealoha, Nahulu, and Sugai were employees and agents of the Honolulu Police Department and the City and County of Honolulu, acting within the scope of their employment or agency.

278.    Defendant Honolulu is liable as principal for all torts committed by its agents.

WHEREFORE, Plaintiff SEFO FATAI, respectfully requests this Court enter a judgment in his favor and against Defendants CITY AND COUNTY OF HONOLULU, SERGEANT EDGAR NAMOCA, OFFICER MARK RAMOS; OFFICER FUMIKAZU MARAOKA, OFFICER JOSHUA NAHULU, OFFICER MARK KEALOHA, and OFFICER BOYCE SUGAI awarding compensatory damages, attorneys' fees and costs against each defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual defendants, and any other relief this Court deems just and appropriate, including but not limited to injunctive and equitable relief against the City of Honolulu.

58

**JURY DEMAND**

Plaintiff SEFO FATAI hereby demands a trial by jury pursuant to Federal

Rule  of Civil Procedure 38(b) on all issues so triable.


DATED: April 7, 2021.

SEFO FATAI

By: /s/ David B. Owens


JENNIFER BROWN, #10885
P.O. Box 8415
Honolulu, HI 96830
(808) 554-5576
hawaiicivilrightsproject@gmail.com

DAVID B. OWENS*
LOEVY & LOEVY
100 S. King Street, #100
Seattle, WA 98104
(312) 243-5900 *admitted pro hac vice

Second Amended Complaint