IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| SEFO FATAI,<br><br>        Plaintiff,<br><br>  vs.<br><br>MARK RAMOS and FUMIKAZU MURAOKA,[1] in their individual capacities,<br><br>        Defendants. | Case No. 19-cv-603-DKW-WRP<br><br>**ORDER DENYING DEFENDANTS' (1) MOTION TO STRIKE AND (2) MOTION FOR SUMMARY JUDGMENT** |

In his Second Amended Complaint ("SAC"), Plaintiff Sefo Fatai asserts various civil rights violations and tort claims against Honolulu Police Department ("HPD") Officers Mark Ramos and Fumikazu Muraoka, arising from the officers' participation in Fatai's August 26, 2011 warrantless arrest and subsequent prosecution for methamphetamine trafficking.  The case against Fatai stemmed from a controlled operation led by Ramos and Muraoka, in which an HPD confidential informant ("CI") purportedly bought drugs from Fatai—a transaction Fatai denies ever happened.  Before the Court is Ramos and Muraoka's Motion for Summary Judgment ("MSJ") on the SAC's ten remaining claims, asserted in

---

[1] This case previously involved Defendants City and County of Honolulu, Edgar Namoca, Joshua Nahulu, Mark Kealoha, and Boyce Sugai.  The claims against these Defendants have since been dismissed, *see* Dkt. Nos. 127, 185, leaving only Defendants Ramos and Muraoka.

Counts I–III and VII–XI,[2] for which Defendants contend there are no genuine factual disputes for trial.

The facts, however, are not so clear.  In particular, there remain genuine factual disputes as to: (i) whether the officers deliberately misrepresented their CI's credibility and reliability in their police reports, search warrant application, and other documentation used in the prosecution against Fatai; (ii) whether the officers deliberately misrepresented the facts surrounding the controlled operation— including whether and to what extent their CI was under constant surveillance during the operation and whether and to what extent they searched her person and vehicle before and after the purported transaction; (iii) whether the officers deliberately suppressed evidence that would have been exculpatory as to Fatai— including an August 24, 2011 search of Fatai immediately following the purported buy that turned up no buy money, drugs, or other contraband; and (iv) whether the officers' actions were motivated by malice.  As a result, as further explained below, the MSJ is DENIED.

## **LEGAL STANDARD**

A court must grant a motion for summary judgment if "the evidence in the record" and "all reasonable inferences from that evidence," when viewed in the light most favorable to the non-moving party, show "that there is no genuine

---

[2]Count III asserts three distinct claims.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005). The movant "bears the initial burden of . . . demonstrat[ing] the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the movant carries that burden, then "[t]o survive summary judgment, [the non-movant] must set forth non-speculative evidence of specific facts" showing there is a "genuine issue for trial." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In assessing a motion for summary judgment, all facts and inferences are construed in the light most favorable to the non-moving party. *Genzler*, 410 F.3d at 636; *Coghlan v. Am. Seafoods Co., LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005).

## FACTUAL BACKGROUND

I.  **Ramos enlists Kristine Medford as a CI.**

In 2011, Ramos and Muraoka, HPD officers assigned to the District 8 "Weed and Seed Detail," were investigating Kristine "Misty" Medford for crystal methamphetamine use and trafficking. Defendants' Concise Statement of Facts ("DCSF") ¶ 1, Dkt. No. 272; Plaintiff's Response to the DCSF ("PRCSF") ¶ 1, Dkt. No. 294 at 5–13; Declaration of Mark Ramos ("Ramos Decl.") ¶¶ 4–5, Dkt.

No. 272-2; Declaration of Fumikazu Muraoka ("Muraoka Decl.") ¶¶ 3, 5, Dkt. No. 272-1.  As part of their investigation, Ramos and Muraoka successfully engaged Medford in two controlled drug buys[3] they intended to use in support of a search warrant application.  DCSF ¶ 4; PRCSF ¶¶ 1, 4; Ramos Decl. ¶¶ 9–10; Muraoka Decl. ¶¶ 8–9; Defendants' Further Concise Statement of Facts ("DFCSF") ¶¶ 38–39, Dkt. No. 302.

On August 23, 2011, armed with this evidence, Ramos approached Medford with the goal of obtaining her cooperation in targeting her drug supplier.[4]  *See* DCSF ¶ 2; PRCSF ¶¶ 2–3.  Though the nature and character of their interaction is disputed, *see infra* at 4 n.5, it appears to be undisputed that Ramos told Medford a search warrant was being sought because of her drug activity, Medford retrieved drugs and money from her bag and surrendered them to Ramos, Ramos threatened arrest and/or prosecution, and, as an alternative, Medford agreed to work for HPD as a CI.[5]  DCSF ¶¶ 2–3, 5, 7; PRCSF ¶¶ 2–5, 7; Plaintiff's Additional Concise Statement of Material Facts ("PACSF") ¶¶ 9–11, Dkt. No. 294 at 14–20; Ramos

---

[3]A controlled buy is an operation wherein an undercover officer or CI purchases a controlled substance from a suspected drug dealer.  *See* Ramos Decl. ¶¶ 9–10.

[4]It is a common HPD practice to utilize the cooperation of lower-level drug dealers to target their distributors.  DCSF ¶ 6; PRCSF ¶ 6.

[5]Fatai correctly claims that there is a genuine issue of material fact as to whether and to what extent Ramos coerced Medford into operating as a CI.  *See* PRCSF ¶¶ 3, 5 (citing Ramos Decl. ¶¶ 17, 25–26 (admitting that "any prosecution of [Medford] at that point would be deemed to be too weak by the prosecutors") and Ramos' first deposition, Dkt. No. 291-6 at 170:23–173:16, 239:4–6, in which Ramos stated that (i) any prosecution of Medford "wouldn't hold up in court" because "[t]hey would say we coerced her" and (ii) his own actions were "just a bluff and a potentially coercive one").

4

Decl. ¶¶ 15–17, 20–21, 23–24, 25–26; Muraoka Decl. ¶¶ 14–17; First Deposition of Mark Ramos ("Ramos Dep-1") at 157:17–162:19–23, 170:21–22, Dkt. No. 291-6. Medford then told Ramos she had been buying methamphetamine for $1,900/oz. for several months from a person called "Junior"—a bald, Polynesian male who drove a silver Lexus with chrome rims. DCSF ¶ 8; PRCSF ¶ 8; Ramos Decl. ¶¶ 29, 32, 35.

## II.   Defendants identify Fatai through a purported controlled purchase operation involving Medford.

Ramos assembled a team, which included Muraoka, to target "Junior" via a controlled purchase operation involving Medford. DCSF ¶ 11; PRCSF ¶ 11; Ramos Decl. ¶¶ 34, 41; Muraoka Decl. ¶ 24.[6]

On August 24, 2011, Ramos and Muraoka met Medford at the Kunia Park and Ride to plan the controlled buy. DCSF ¶ 13; PRCSF ¶ 13. Medford drove her SUV to the meet location. While there, in the officers' presence, Medford attempted to call Junior, but Junior did not answer. Instead, Tanya Waller, Junior's employer, returned the call. Though the officers could not hear Waller's side of the conversation, Medford later explained that Waller claimed to be with Junior,

---

[6]The intent behind the August 24 controlled operation is disputed—that is, whether the officers intended it to be a "buy-bust," resulting in Junior's immediate arrest following the transaction, or a "buy-walk," in which the officers would allow the buy money to "walk" away, using the opportunity only to identify Junior and effect any arrest at a later time. *Compare* DCSF ¶¶ 10, 30, *and* Ramos Decl. ¶¶ 34, 72–73, *and* Muraoka Decl. ¶ 42, *with* PRCSF ¶¶ 10, 30, *and* PACSF ¶¶ 18, 30, *and infra* at 9 (describing a search of Fatai's vehicle for the buy money after the operation).

was returning Medford's call on Junior's behalf, and instructed Medford to meet

Junior at a nearby Chuck E. Cheese.  DCSF ¶¶ 17–18; PRCSF ¶¶ 17–18; Ramos

Decl. ¶¶ 34, 49, 54, 56.

Fatai admits he agreed to meet Medford at the Chuck E. Cheese, but not for

the purpose of selling methamphetamine.  According to Fatai, Waller told him that

Medford owed her $100 as a result of a loan four months prior and asked him to

meet Medford to pick up her payment.   PACSF ¶¶ 2–4; Deposition of Sefo Fatai

("Fatai Dep.") at 194:4–195:16, Dkt. No. 291-31; *see also* Dkt. No. 272-7 at

185:8–24 (Fatai's trial testimony); Dkt. No. 272-7 at 168:20–170:13 (Waller's trial

testimony).

At the Park and Ride, understanding that the meet was to be a controlled

buy, Ramos and Muraoka gave Medford $1,900 in unmarked, unrecorded bills.[7]

The officers directed her to drive to the Chuck E. Cheese in her own SUV, conduct

the transaction with Junior, and return to the Park and Ride.  PACSF ¶ 16; DFCSF

¶ 16.  Before leaving, the officers claim they performed a "thorough 'no touch'

search" of Medford's person, along with a "thorough search" of her SUV.  DCSF

¶¶ 14, 16.  However, as discussed more fully *infra* at 12–15, there is evidence in

the record that they did not do so.  PRCSF ¶¶ 14–17.

---

[7]Ramos' failure to pre-record the serial numbers of these bills violated HPD policy.  PACSF
¶ 16; DFCSF ¶ 16; Ramos Decl. ¶ 107; *see* Dkt. No. 305-4 at 13–14 (text of HPD policy).

Following the search by the officers, Medford drove alone to the Chuck E. Cheese[8] and waited.  DCSF ¶¶ 18–19; PRCSF ¶¶ 18–19.  Shortly thereafter, Fatai arrived in a silver Lexus with chrome rims and backed into a parking spot near where Medford was waiting.  DCSF ¶ 20; PRCSF ¶ 20.  Medford exited her SUV and entered the front passenger side of Fatai's Lexus.  DCSF ¶ 20; PRCSF ¶ 20.

It is undisputed that no officers could hear what was said within the Lexus, nor, from their vantage point, see what occurred beneath the dashboard.  DCSF ¶ 20; PRCSF ¶ 20; PACSF ¶¶ 17, 28; DFCSF ¶ 17; Deposition of Mark Kealoha ("Kealoha Dep.") at 4, 22–23, Dkt. No. 291-32.[9]  As a result, what occurred within the Lexus is disputed.[10]  According to Fatai, after he parked, he was preparing to exit his car and enter the Chuck E. Cheese to meet Medford and collect the $100 owed to Waller, when Medford surprised him by entering his car.  PACSF ¶¶ 4–6.  Fatai waited for the $100, but Medford instead "reached [] underneath her bra and pulled out a [plastic] bag" containing a small amount of methamphetamine, about the size of a quarter, and attempted to give it to Fatai.  *Id.*  Fatai rejected the drug offering, explaining he was only there to pick up $100, and Medford soon exited

---

[8]There was no surveillance equipment, such as a video camera or audio recorder, in Medford's SUV.  *See* DCSF ¶¶ 16, 19–20; Ramos Dep-1 at 247:7-10.

[9]Officer Mark Kealoha, a member of the surveillance team, was a short distance away inside the Chuck E. Cheese and facing the rear of Fatai's Lexus.  He saw Fatai and Medford talking and gesturing, but could not see "below the dashboard."  Declaration of Mark Kealoha ("Kealoha Decl.") ¶¶ 6, 8–11, 13, Dkt. No. 272-3.

[10]Defendants claim Fatai sold Medford an ounce of methamphetamine and fronted her an extra ounce, contained within a plastic bag placed inside a Crystal Light box.  *See generally* DCSF.

the Lexus. *Id.* Fatai says he then called Waller, but she did not answer. Approximately thirty minutes later, Waller returned Fatai's call, and he told her what had happened. *Id.* Waller was "upset" and called Medford. Medford told Waller she had thought Fatai would accept the drugs in lieu of $100, at which point Waller hung up. Dkt. No. 272-7 at 170:16–171:25.[11]

After Medford re-entered her SUV, both Fatai and Medford left Chuck E. Cheese. DCSF ¶ 21; PRCSF ¶ 21. Medford returned to the Park and Ride. Once there, she handed Ramos an undamaged, cardboard Crystal Light box containing a plastic baggie holding approximately two ounces of methamphetamine and—ostensibly no longer in possession of the $1,900 in buy money—indicated she had given Fatai the $1,900 in exchange for the drugs. DCSF ¶¶ 24–25; PRCSF ¶ 24.[12]

---

[11]Fatai's account of these events is principally detailed in his deposition at 168:16–25, 186:16–188:25, 196:8–197:8. His account is bolstered by other evidence in the record, some of which is disputed, including (i) that no officer surveilling the controlled operation at the Chuck E. Cheese actually saw any transaction take place, *see supra* at 7, (ii) that Medford did not appear to be clutching anything in her hands when she exited the Lexus, such as the package of drugs she claimed Fatai sold her, *see* PACSF ¶ 6; Ramos Dep-1 at 335:14-336:17; Kealoha Dep. at 25:17-26:10, (iii) that Medford did not know that the bag contained an extra ounce of methamphetamine when she arrived at the Park and Ride, *see infra* at 8 n.12, and (iv) that Fatai was searched shortly after leaving the Chuck E. Cheese, but the buy money was not recovered, *see infra* at 9.

[12]Defendants claim that Medford alerted Ramos at this time about the disparity between the amount of drugs she had been expecting—one ounce—versus the amount she received—two ounces. *See* DCSF ¶ 25; Ramos Decl. ¶ 69. However, the timing of that supposed notice is far from clear. *See* PRCSF ¶ 25 (noting there is no contemporaneous documentation of this statement by Medford, and that the statement only appeared in police documentation *after* the drugs had been analyzed by the crime lab and found to weigh two ounces); Dkt. No. 291-23 (lab report dated August 25, 2011 at 11:20 a.m.); Dkt. No. 291-5 at 8, 12 (search warrant affidavit prepared August 25, 2011 at an unknown time before 12:40 p.m.); Dkt. No. 291-19 (Ramos' police report, created August 26, 2011); Dkt. No. 291-1 (same for Muraoka's report). Among other things, this discrepancy may be relevant to Medford's veracity and reliability and to

Meanwhile, shortly after leaving Chuck E. Cheese, Fatai noticed he was being followed by two "solo bike" officers on motorcycles wearing blue police uniforms. PACSF ¶¶ 7–8, 18. After a few minutes, the officers pulled him over. *Id.* First, the officers asked for his driver's license, thereby learning his identity for the first time. *Id.* Then, without providing a reason, they directed him to stand on the sidewalk and searched his person by having him empty his pockets and take off his shoes. *Id.* They then searched his Lexus—between the seat cushions, underneath the seats and dashboard, inside the center console and glove box, inside the "little coin bin," behind the visors, inside the trunk, and underneath where the spare tire was kept. *Id.* While the officers were searching the Lexus, Muraoka pulled up. *Id.* The officers found no buy money, drugs, or other contraband during their search. *Id.* Fatai was then allowed to re-enter his vehicle, and he watched in his rearview mirror as the two officers, seemingly "confused," spoke to Muraoka. *Id.* They made a call on the radio or phone, after which one of the solo bike officers returned to Fatai's car window, told Fatai they had stopped him for a "traffic violation," gave him a "warning," and permitted him to leave. *Id.* Fatai was "grateful [he] didn't get a ticket" and otherwise "didn't think nothing of it." *Id.*[13]

---

whether the officers painted an accurate picture of the CI on whom they were heavily relying in subsequent documentation, including their warrant application.

[13]This version of events is principally supported by Fatai's deposition at 89:1–25, 121:2–126:24, 146:1–23, 187:6–197:24, and his trial testimony, *see* Dkt. No. 272-7 at 189:9–192:18. But it is

After the search of Fatai's person and vehicle, Muraoka returned to the Park and Ride to meet Ramos and Medford.  Ramos gave Muraoka the Crystal Light box and baggie of drugs for processing.  DCSF ¶ 26; PRCSF ¶ 26.  Muraoka discarded the Crystal Light box by leaving it on a workspace desk—ultimately losing track of it[14]—and submitted the drugs to the crime lab for analysis.  PACSF ¶¶ 33–35; DFCSF ¶¶ 33–35; First Deposition of Fumikazu Muraoka ("Muraoka Dep-1") at 34:23–43:25, Dkt. No. 291-3.[15]  The next day, August 25, 2011, at 11:20 a.m., the lab returned its report indicating that the baggie contained approximately two ounces of methamphetamine.  Dkt. No. 291-23.

---

also bolstered by other evidence, including Ramos' testimony during cross-examination at trial, *see* Dkt. No. 291-8 at 87:7–88:11 (answering in the affirmative when asked during 2015 trial whether "[Muraoka] also searched Sefo's vehicle for the buy money" on August 24); *see also* Dkt. No. 291-10 at 23:3–15, 24:23–25:22 (2016 trial defense counsel opening statement referring to this testimony), which he later recanted, *see ibid.* at 90:24–91:8 (Ramos correcting himself on re-direct to say he had misspoken and Muraoka did *not* search Fatai's vehicle on August 24).
[14]It is undisputed that Muraoka discarded or lost the Crystal Light box, and that it was never included in any police reports, photographed, or analyzed as evidence.  DCSF ¶ 29; PACSF ¶¶ 33–35; Ramos Decl. ¶¶ 72–73; Muraoka Decl. ¶¶ 41–42.  What is unclear is *why* Muraoka did not submit the box for evidence.  *See* DCSF ¶ 29; Ramos Decl. ¶¶ 72–73 (claiming that it was "customary" not to submit an item into evidence if the operation was not intended for prosecution).  *But see supra* at 5 n.6 (assuming the August 24 operation *was* intended for prosecution); PRCSF ¶ 29 (disputing that it was "customary" in any event); Dkt. Nos. 291-15 at 3; 305-4 at 16 (HPD policy describing items like the Crystal Light box as evidence); Second Deposition of Fumikazu Muraoka ("Muraoka Dep-2") at 41:11–24, Dkt. No. 291-28 (Muraoka confirming he should not have destroyed the Crystal Light box); Muraoka Dep-1 at 37:7–9 (stating a different reason for his failure to submit the box for analysis).
[15]There is a dispute of fact as to whether Muraoka had the plastic baggie dusted for prints. *Compare* DCSF ¶¶ 26–28 (claiming Muraoka had the baggie dusted for prints and none were found), *with* PACSF ¶ 29; Dkt. No. 291-1 (Muraoka August 26, 2011 police report stating the bag was "not dusted"), *and* Dkt. No. 291-30 (lab tech stating she did not notice any black powder on the baggie).  *But see* Muraoka Dep-1 at 111:2–112:5 (claiming his report was erroneous); Ramos Dep-1 at 350:23–351:18 (claiming Muraoka told him he had the bag dusted).

**III.      Ramos applies for a search warrant for Fatai's person and vehicle, and a judge issues the warrant.**

On August 25, 2011, Ramos and Muraoka planned for Medford to set up another transaction with Fatai, at which time the officers would execute a search warrant for Fatai's person and Lexus.  In pursuit of this plan, the officers applied to a judge for a search warrant.  DCSF ¶ 32; PRCSF ¶ 32; Dkt. No. 291-5 (search warrant).

The content of the search warrant application is undisputed.  *Ibid.*  Ramos, the warrant affiant, informed the judge that there was probable cause to believe the search would uncover evidence of methamphetamine trafficking.  *Id.*  In support, he described Medford's version of the purported August 24 transaction, stating that, after Medford entered the Lexus, "Fatai asked [Medford] for the monies; [Medford] gave the pre-recorded monies to Fatai; Fatai accepted the pre-recorded monies from [Medford]; Fatai then handed [Medford] one (1) clear plastic bag containing a white crystal-like substance resembling methamphetamine; [and] Fatai told the Informant that he is giving her two ounces instead of one, and that [she] can pay him later."  *Id.* at 1–3, 5–7, 9–17.

The warrant application also contained some details that were not true: (i) it stated that *Medford* had contacted *Ramos* to indicate her willingness to assist with a controlled operation against Fatai, when, in fact, Ramos had initiated the contact, *id.* at 9; DCSF ¶¶ 2–3; (ii) it stated that, after Medford called Fatai's cell phone,

11

*Fatai* had instructed her to meet him at Chuck E. Cheese, when, in fact, Medford spoke to *Waller*, Dkt. No. 291-5 at 10, 12; DCSF ¶ 18; (iii) it repeatedly stated that the $1,900 in buy money Ramos issued to Medford was "pre-recorded"—meaning the serial numbers of the bills had been recorded prior to issuing the monies to Medford, as required by HPD policy—when it was not, Dkt. No. 291-5 at 11–12; DCSF ¶ 43; Ramos Decl. ¶ 107; Ramos Dep-1 at 359:16–360:15 (claiming this was "[n]ot false," but a "typo"); and (iv) it omitted reference to the Crystal Light box in which Medford supposedly received the drug delivery from Fatai.  Dkt. No. 291-5 at 11; DCSF ¶ 24.

Several other claims in the warrant are in dispute, and, at this stage, must be viewed in the light most favorable to Fatai as the non-movant:

A.   Search and Surveillance of Medford

The application stated that Medford's person and SUV were searched before and after the purported transaction, and that she was "under constant surveillance" during the entire operation.  Dkt. No. 291-5 at 10–12.[16]  For instance, Ramos states that he conducted a "thorough 'no touch' search" of Medford's person both before and after her trip to Chuck E. Cheese, during which he instructed her to

---

[16]HPD policy explains why a thorough search is important and why the warrant affiant described it as such: officers must "[t]horoughly search the informant and informant's vehicle for any additional funds and other contraband prior to informant meeting with the suspect, and also immediately after the transaction," and "[a]ttempt to have a close surveillance placed on the informant before and after meeting with the suspect to insure the contraband came from the particular suspect and scene."  Dkt. No. 305-4 at 15.

"open her waist band, empty her pockets, turn around and do the same thing in the back, pull her pants tight, shake her bra, etc." DCSF ¶¶ 14–16; Ramos Decl. ¶¶ 50, 52, 68, 80; Muraoka Decl. ¶¶ 30–33, 44–46 (claiming he witnessed this search). Ramos also claims Medford was "very skinny (flat chested, flat butt) such that any bulges would be noticeable on her."[17] DCSF ¶¶ 14–16; Ramos Decl. ¶ 52. Defendants also claim they "thoroughly searched Medford's car" before and after the operation and found no drugs or buy money. DCSF ¶¶ 14–16; Ramos Decl. ¶¶ 53, 80–81 (stating he "searched the driver's side from front to back, which includes compartments, consoles, and under carpets"); Muraoka Decl. ¶¶ 30–32 (similar).[18] They further state there was "constant surveillance of Medford by one or more members of the team" at all times. DCSF ¶¶ 14–16; Ramos Decl. ¶¶ 80–81.

---

[17]It is undisputed that the officers did not touch Medford during the search because she was female and the investigating officers, including Ramos and Muraoka, were male. *See* DCSF ¶ 14; PRCSF ¶ 14; Dkt. No. 291-8 at 75:2–77:10 (Ramos trial testimony stating that he was "not allowed to touch [Medford]" because she was a female); Dkt. No. 291-11 at 17:21–24 (Muraoka stating that it is "the policy of the [HPD] that females should be searched by female officers"). However, the *reason* Ramos failed to enlist a female officer to conduct the search is in dispute. *Compare* Muraoka Dep-1 at 24:23–25:5 (stating that "at the last minute, we couldn't find the female to make the search of Misty prior to the purchase, so Officer Ramos told me he was authorized to do a search on his own but for me to accompany him to witness it or assist him with the search . . . ."), *and* Ramos Dep-1 at 376:18–378:20 (stating "[n]o [female officer] was available at the time"), *and* Dkt. No. 291-10 at 39:19–40:8, 62:1–11, 90:14–19, 94:13 (Ramos trial testimony stating, "[W]e had no female officers available, [so] we had to search her visually" and "we got to make do with what we got"), *with* Ramos Dep-1 at 82:4–83:18 (stating that he *intentionally* neglected to coordinate a female officer because he did not trust officers outside his internal operation to interact with CIs).

[18]*But see* Ramos Decl. ¶ 53 (stating it was not necessary to search some areas of Medford's SUV because she was under constant surveillance and would not have access to those areas).

However, several of these claims are disputed, starting with: (i) Fatai's denial of having given anything to Medford, such as a Crystal Light box containing drugs, *see supra* at 7–8, and (ii) Fatai's statement that it was Medford who offered him methamphetamine that she pulled from underneath her bra, *see id.* These assertions mean that the Crystal Light box containing methamphetamine could only have originated with Medford and that she kept the $1,900 after the operation concluded—making it unlikely that the officers conducted the thorough searches or maintained the constant surveillance they claimed.

Other evidence supports Fatai's claims. For instance, over the eleven-year history of this case, not a single one of the officers' many search descriptions *prior* to their October 2022 summary judgment declarations ever mentioned anything about having Medford "shake her bra."[19] Perhaps the officers, now facing a trial challenging their own conduct, have suddenly recalled additional details. But

---

[19]*See, e.g.*, Muraoka Dep-1 at 149:21–150:7, 156:2–8 (taken in June 2022, describing the search of Medford in detail, to include instructing Medford to lift up her shirt just above her waistline, turn around, lift up her pants cuffs to show nothing in the ankle area, and empty her pockets); Dkt. No. 291-8 at 39:19–40:8, 75:2–77:10 (Ramos trial testimony stating that he "ma[d]e her turn around, check her pockets, . . . lift up her pants[,] . . . turn around and lift up her arms and . . . her shirt so we can see the waist and stuff like that, but not exposing anything because she's a female"); *ibid.* at 39:19–40:8 (separately testifying he "ha[d] her stand in front of us, lift up her shirt by her waistline, check her waistline, empty the pockets, lift up her pants, and then just spin around so we can observe if the amount that we was buying could be concealed on her"); *ibid.* at 59:12–60:19 (Ramos trial testimony specifically stating she lifted up her shirt just "to eyeball the waist area," and that "all [he] w[as] able to see was her waist area"); Dkt. No. 291-11 at 14:6–18 (Muraoka testifying similarly); Muraoka Dep-1 at 154:1–155:7 (Muraoka's police reports containing no reference to a search, either of Medford's person or vehicle); Ramos Dep-1 at 149:22–150:6 (same, for Ramos' reports).

viewed in the light most favorable to Fatai, fabrication could be in play.[20]  Further, the officers' failure to employ a female officer, in violation of HPD policy, to conduct a more thorough search of Medford than they clearly could have done themselves impugns whatever effort they did make, particularly as the operations on August 24 were "planned"—*i.e.*, not the product of a last-minute or emergent effort when the absence of a female officer might have been excused.  *See supra* at 13 n.17 (noting HPD policy required a female-female search); Dkt. No. 291-10 at 62:1–11 (Ramos trial testimony admitting if he had used a female officer, "she could have done a very thorough search" of Medford's person).  Again, viewed in the light most favorable to Fatai, this failure calls into serious question Medford's veracity and reliability, discussed further below, both of which the officers vouched for in their warrant application.

B.   Medford's Reliability

The search warrant application stated that Medford was a "Reliable Informant," detailing that:

> [Ramos] ha[d] been using [Medford] for the last six months and the information provided ha[d] resulted in two (2) Methamphetamine Trafficking in the Second Degree cases and two (2) on-going narcotic investigations, [and the i]nformation provided by [Medford] ha[d] been found to be truthful and ha[d] been corroborated through investigation and independent sources.

---

[20]Faulty memory could also be responsible. *See, e.g.*, Muraoka Dep-1 at 150:24–151:24 (stating he could not remember details about Medford's vehicle, such as whether it was clean, whether it contained any bags or containers or children's toys, etc.); Ramos Dep-1 at 233:8–237:6 (similar, for Ramos).

Dkt. No. 291-5 at 17.

Viewing the evidence in the light most favorable to Fatai, these claims are of questionable veracity.  First, it is undisputed that Medford *never* operated as a CI for Ramos prior to August 23, 2011.  PACSF ¶ 1; *see generally* DFCSF (neglecting to refute this contention).  At best, Medford may have served HPD generally in some less formal capacity.  *Compare* Muraoka Decl. ¶¶ 10–12 ("Medford named multiple possible suspects in things such as burglaries that ended up being useful to further investigations."), *and* Ramos Decl. ¶ 11 ("While it was a long time ago, and I don't recall specific names, I know that she gave us information about other drug activities that turned out to be correct and reliable."), *and ibid.* ¶ 11 ("The information given to me was primarily drug related, but there was some other miscellaneous crimes information given by Medford as well, which would have been passed on to the Crime Reduction Unit or the other appropriate Division."), *with* Second Deposition of Fumikazu Muraoka ("Muraoka Dep-2") at 24:15–25:12, 35:17–21, 38:13–16, Dkt. No. 291-29 (repeatedly stating that he had no recollection or knowledge of Medford having ever given them or any other officer reliable information or furthered any other criminal investigation or prosecution prior to this case).

Second, Ramos *omitted* from the warrant affidavit information pertinent to Medford's reliability, even though the "Reliable Informant" section of the affidavit

was intended to inform the judge that Medford "[wa]s a person who c[ould] be trusted," and that "the information that [the officers] received [from Medford wa]s reliable." Ramos Dep-1 at 361:17–366:25. For example, the application neglected to disclose that Medford herself had been the target of two successful controlled-buy operations, *see* PACSF ¶ 4; Ramos Decl. ¶¶ 6–8; Muraoka Decl. ¶¶ 6–8; Muraoka Dep-1 at 23:17–25:11, 88:7–92:8, and did not set forth her criminal history. *See e.g.*, Dkt. No. 272-13 at 22–23 (noting that Medford may have had "[eleven] prior theft and forgery cases" against her).

C.    August 24, 2011 Fruitless Search of Fatai and his Vehicle

The search warrant also omits any reference to the August 24, 2011 search of Fatai's vehicle after its departure from the Chuck E. Cheese parking lot. While that may be understandable, given that Defendants maintain this search never occurred, viewed in the light most favorable to Fatai, the Court must assume that it did, that it would have informed any probable cause determination, and that decisionmakers, including the prosecuting attorney and the state court judge, did not have the benefit of this omitted information.

\*\*\*

On August 25, 2011 at 12:40 p.m., a prosecuting attorney reviewed the warrant application, and a judge issued the warrant the same day at 1:00 p.m. Dkt. No. 291-5 at 4, 8.

17

**IV.      Ramos executes the search warrant and supervises Fatai's arrest.**

On August 26, 2011, upon Ramos' instruction, Medford arranged for

another meeting with Fatai through Waller, this time at the Ewa Beach Town

Center Subway restaurant.  *See* Ramos Decl. ¶ 85; Arresting Officer's Arrest

Report ("Nahulu Arrest Rep.") at 1, Dkt. No. 291-20 at 1.[21]  Again, the purpose of

this meeting is disputed.  Medford purportedly told the officers that she had

arranged for Fatai to travel to the Subway for another drug transaction, at which

point the officers would present their search warrant and find the drugs.  But

according to Fatai, Medford had called Waller, apologized for what had happened

on August 24, and stated that "[t]his time she had the money."  Dkt. No. 272-7 at

172:9–173:3, 193:6–13 (trial testimony).  Waller called Fatai and asked him to

meet Medford again to collect the $100 debt, and he agreed.  PACSF ¶ 21; Fatai

Dep. at 172:9–173:3, 175:19–176:1, 193:6–13.[22]

At approximately 1:20 p.m., Fatai arrived at the Subway in his Lexus, and

Ramos and his team prepared to execute the search warrant.  Nahulu Arrest Rep. at

1; Deposition of Joshua Nahulu ("Nahulu Dep.") at 31–34, Dkt. No. 291-33.

Officer Nahulu approached Fatai sitting in the driver's seat of the Lexus, identified

---

[21]The details of how this meeting was arranged—including why it was again arranged through
Waller—are not in evidence.
[22]When asked why he would have gone to meet Medford again on August 26 after what
happened on August 24, Fatai explained he had not thought much of Medford's attempt to give
him methamphetamine in lieu of $100, and did not mind making another attempt to collect the
debt, as a favor to Waller.  Fatai Dep. at 175:19–176:1.

himself, and informed Fatai of his drug investigation.  Nahulu Arrest Rep. at 2.

Fatai responded by being "very cooperative" and providing identification.  *Id.*;

Dkt. No. 291-9 at 21:5–23:20 (Nahulu trial testimony).  Nahulu then removed Fatai

from his vehicle and detained him.  *Ibid.*  Ramos presented and executed the search

warrant, and officers performed a thorough search of Fatai's person and vehicle.

Ramos Decl. ¶¶ 74, 83.

The search turned up no drugs or other contraband.  DCSF ¶ 33.

Nonetheless, and even though Fatai was supposedly at Subway, according to

Medford, to sell her more drugs, the officers booked Fatai and initiated criminal

proceedings.  DCSF ¶¶ 30, 35–36; Ramos Decl. ¶¶ 74, 86, 88–89.  Officers also

seized Fatai's Lexus, based on its use during the August 24 meeting at Chuck E.

Cheese.[23]  DCSF ¶ 45; PRCSF ¶ 45; Ramos Decl. ¶¶ 3, 103.

### V.     Defendants belatedly produce the required police reports in support of Fatai's arrest and prosecution.

On August 26, 2011, Ramos and Muraoka wrote police reports, detailing for

the first time their accounts of the events of August 24, 2011.  *See* Dkt. No. 291-1

(Muraoka report); Dkt. No. 291-19 (Ramos report); Muraoka Dep-1 at 48:5–20;

106:5–8 (stating that he wrote his police reports at 7:13 p.m. on August 26).  It

appears to be undisputed that HPD policy required these reports to be written by

---

[23]Fatai claims the Lexus belonged to him, but he had not yet registered it in his own name because he had only owned it for "a week or two."  Fatai Dep. at 181:24–183:25.

the end of their August 24, 2011 shifts, not two days later.[24]  PRCSF ¶ 31; PACSF ¶ 22; DFCSF ¶ 22; Ramos Decl. ¶ 100.

It also appears to be undisputed that the timeline of the August 24 events, as documented in the tardy police reports, was not accurate.  Ramos Dep-1 at 301–307 (referring to the timeline entries as "typographical errors").  Ramos' report, for instance, states that the alleged drug transaction occurred at Chuck E. Cheese at 5:30 p.m., with a debrief at the Park and Ride at 5:40 p.m., and Ramos transferring the drugs to Muraoka at the Park and Ride at 5:45 p.m.  Dkt. No. 291-19 at 3; *see also* Dkt. No. 291-1 (documenting similar timing).  Given the distance between the Chuck E. Cheese and the Kunia Park and Ride, the fact that traffic was "kind of bad on Kam. Highway that day," and the traffic stop conducted by Muraoka—even without the lengthy search alleged by Fatai—this timeline of events is impossible. *See* PACSF ¶ 31; DFCSF ¶ 31 (admitting the "report is not perfect"); Muraoka Dep-1 at 117:12–14, 128:23–129:1, 133:17–19.

---

[24] *Why* the reports were submitted late is disputed.  The officers allege they failed to complete the August 24 police reports on-time because they had not intended the August 24 operation for prosecution, but only as a buy-walk.  DCSF ¶¶ 30, 33, 36, 41; DFCSF ¶ 31.  Thus, they claim that, once the arrest became based on the August 24 operation alone, they had to "work backwards" to prepare their police reports after-the-fact.  *See* DCSF ¶ 41; Ramos Decl. ¶¶ 74–75. Fatai disputes the nature of the operation.  *See supra* at 5 n.6.  Moreover, even if the officers were not planning to use the August 24 operation as the basis for prosecution, it appears they were still required to complete their reports that day.  *See* Dkt. Nos. 305-3, No. 291-16 at 1–2, 8 (HPD policy stating that reports must be completed by the end of the scheduled work shift during which the officer becomes aware of the *occurrence* necessitating the report "regardless of the likelihood of later prosecution").

On August 27, 2011 at 2:45 p.m., Medford provided a written statement. Dkt. No. 291-24.  Again, it appears to be undisputed that this statement should have been taken sooner, if for no other reason than to maximize memory recall. *See* Ramos Dep-1 at 326:20–327:12, 332:1–334:11 (stating that he should have gotten Medford's statement before Fatai's arrest).

## VI.     Criminal proceedings against Fatai ensue and culminate in no conviction.

On August 27, 2011, Ramos referred the case to the Department of the Prosecuting Attorney ("DPA") to initiate charges.  DCSF ¶ 38; PRCSF ¶ 38.  The same day, bail was set at $50,000, and Fatai posted bond and was released.  DCSF ¶ 38; PRCSF ¶ 38; Fatai Dep. at 154:9–155:5, Dkt. No. 302-3.

On August 30, 2011, after hearing testimony from Ramos and Muraoka, a grand jury indicted Fatai, finding that there was probable cause to believe Fatai had committed a single count of methamphetamine trafficking.  DCSF ¶ 47; PRCSF ¶ 47; Dkt. No. 272-13 at 2–3.  Despite the indictment, Fatai remained out on bail, pending trial.  *See* PRCSF ¶ 38.

On January 28, 2013, the indictment was dismissed without prejudice because Medford could not be located to testify.  DCSF ¶ 48; PRCSF ¶ 48; Dkt. No. 272-13 at 3.

On August 21, 2013, Medford was located, and, after hearing testimony from Ramos and Muraoka, a second grand jury found probable cause and indicted

21

Fatai for the same offense.  DCSF ¶ 49; PRCSF ¶ 49.  Fatai nonetheless remained
out-of-custody awaiting trial.  *See* PRCSF ¶ 38.

On December 30, 2014, Fatai was arrested and incarcerated for disputed
reasons.  DCSF ¶ 50 (contending he was incarcerated for "criminal contempt");
PRCSF ¶ 50 (contending he was simply re-arrested after he had been re-indicted by
the grand jury).  His bail was again set at $50,000, for which he posted bond on
January 7, 2015.  DCSF ¶ 50; PRCSF ¶ 50; Dkt. No. 272-9 at 6, 13; Fatai Dep. at
154:17–25, 193:3–24, Dkt. No. 302-3.

Fatai's first trial commenced on September 4, 2015 and ended in a mistrial
on September 9, 2015, due to Medford's repeated violations of the court's orders.
DCSF ¶ 52; PRCSF ¶ 52; Dkt. No. 272-13 at 10.[25]

On September 11, 2015, for disputed reasons,[26] the state judge altered
Fatai's conditions of release by imposing a curfew requiring him to be at home
between the hours of 6:00 p.m. and 6:00 a.m.  DCSF ¶ 54; PRCSF ¶ 54; Dkt. No.

---

[25]Prior to trial, the judge had prohibited the State from soliciting any testimony from Medford
about any previous interactions Medford may have had with Fatai.  *See* DCSF ¶ 51; PRCSF ¶ 51;
Dkt. No. 272-10 at 22.  However, during the State's direct examination of Medford, Medford
repeatedly referred to such previous interactions in front of the jury, and the judge ordered a
mistrial.  DCSF ¶ 52; PRCSF ¶ 52; Dkt. No. 272-10 at 33–34; Dkt. No. 272-13 at 10.
[26]As of August 21, 2013, Fatai was subject to an order not to contact or communicate with
Medford.  DCSF ¶ 49; PRCSF ¶ 49; Dkt. No. 272-11 at 2.  On September 4, 2015, on the way to
the courtroom before trial, Medford, two protective officers, and Fatai ended up in an elevator
together.  According to an affidavit by the State, Medford claimed that Fatai threatened harm to
her if she testified against him.  *See* DCSF ¶¶ 53–54; Dkt. No. 272-11 at 2–3, 8–11 (elevator
incident).  As a result, the judge imposed the curfew.  Fatai denies the threat occurred.  PRCSF
¶¶ 53–54.

272-11 at 14; Fatai Dep. at 205:11–207:4.  Then, on September 16, 2015, an officer pulled Fatai over for driving home from his job as a laborer past 6:00 p.m. As a result, on September 23, 2015, the judge issued a bench warrant stating that Fatai had violated the curfew and increasing his bail to $75,000.  Dkt. Nos. 272-11 at 16, 272-12 at 5, 9; Fatai Dep. at 207:5–9, 208:12–21.  Fatai was subsequently arrested on September 30, 2015 and was unable to post bond, and thus remained incarcerated until his ultimate release in January 2018.  Dkt. No. 272-11 at 16; Fatai Dep. at 208:16–209:1.

Fatai's second trial commenced on March 14, 2016.  DCSF ¶ 55; PRCSF ¶ 55; Dkt. No. 272-13 at 3, 11.  This trial ended in a deadlocked jury, with nine jurors voting guilty and three jurors voting not guilty, resulting in declaration of a mistrial on March 17, 2016.  DCSF ¶ 55; PRCSF ¶ 55; Dkt. No. 272-13 at 3, 11.

On May 3, 2016, Fatai's counsel moved to dismiss the indictment with prejudice.  Dkt. No. 272-13 at 1.  On July 7, 2016, the court denied the motion. Dkt. No. 272-13 at 17.

Following a series of continuances and changes in defense counsel, Fatai's third trial was set to commence on January 16, 2018.  Dkt. No. 272-14 at 25; DCSF ¶¶ 57–59; PRCSF ¶¶ 57–59.  However, Medford again could not be located to testify, and the court dismissed the case with prejudice for lack of prosecution. Dkt. No. 272-16 at 12–13; DCSF ¶ 59; PRCSF ¶ 59.  The same day, Fatai was

released from Oʻahu Community Correctional Center, having been incarcerated from September 30, 2015 to January 11, 2018, along with the prior incarcerations from August 26 to 27, 2011 and December 30, 2014 to January 7, 2015.  Fatai Dep. at 208:24–209:1, 238:4–6, Dkt. No. 302-3.  Fatai's Lexus and other seized items have never been returned.  *See* Dkt. No. 271-1 at 18–20.

## PROCEDURAL BACKGROUND

Fatai initiated this action on December 17, 2019,  Dkt. No. 1, followed by the filing of a First and then Second Amended Complaint ("SAC") on April 7, 2021.  Dkt. Nos. 44 and 101.  The SAC asserts various claims against the City and County of Honolulu ("City"), along with several individual Defendants in their individual and official capacities, to include Ramos and Muraoka.  *See* Dkt. No. 127 at 1, 8–9, 42.

On July 13, 2021, pursuant to Defendants' motions to dismiss, Dkt. Nos. 104, 105, this Court dismissed Counts I, IV, V, and VI against all Defendants, along with all remaining claims against the individual Defendants, other than Ramos and Muraoka in their individual capacities.  *Id.* at 42.  On January 3, 2022, upon the City's motion, Dkt. No. 166, the Court granted summary judgment in the City's favor on Count XII, leaving Counts II, III, and VII–XI against Ramos and Muraoka.  Dkt. No. 185 at 9–10.  On July 8, 2022, upon Fatai's motion, Dkt. No. 220, the Court reinstated Count I against Ramos and Muraoka alone.  Dkt. No.

24

239.   Therefore, the remaining Counts are I–III and VII–XI of the SAC, asserted against Ramos and Muraoka in their individual capacities.

On October 13, 2022, Ramos and Muraoka filed the instant MSJ, along with a concise statement of facts, DCSF.  Dkt. Nos. 271–272.  On December 12, 2022, Fatai opposed the MSJ, *see* Dkt. Nos. 291, 293, and filed a nine-page "Response to Defendants' Statement of Material Facts," PRCSF, Dkt. No. 294 at 5–13 along with a five-page "Additional Concise Statement of Facts," PACSF, Dkt. No. 294 at 14–18.  The next day, Defendants filed a Motion to Strike both sections of Fatai's opposing concise statements, Dkt. No. 294, arguing that his use of fourteen pages for the same constituted a violation of this Court's local rules.[27]  Dkt. No. 296.  In the alternative, Defendants asked this Court to strike all but the first five pages of Fatai's concise statement.  *Id.*  On December 19, 2022, Fatai opposed the Motion to Strike.  Dkt. No. 300.

On December 22, 2022, Defendants filed Reply briefs regarding both the Motion to Strike and the MSJ, along with a five-page concise statement of facts, DFCSF, that was responsive to Fatai's additional CSF.  Dkt. Nos. 301–303.  On

---

[27]Previously, on November 14, 2022, Fatai had filed a motion for leave to file excess pages in his responsive brief and concise statement of facts.  Dkt. No. 286.  Following Defendants' opposition on November 18, 2022, Dkt. No. 289, the Court denied that motion.  Dkt. No. 290.  Thus, Defendants' Motion to Strike also argued that Fatai had intentionally flouted the Court's denial of his motion for excess pages.  Dkt. No. 296-1 at 2–3.

January 6, 2023, the Court heard oral argument on these matters, and this Order

follows.  *See* Dkt. No. 306.

## DISCUSSION

### I.   Motion to Strike

The Local Rule on which Defendants' Motion to Strike is based provides, in

relevant part:

> (a) A motion for summary judgment shall be accompanied by a
> supporting memorandum and a separate concise statement detailing
> each material fact that the movant contends is undisputed and
> essential for the court's determination of the motion. . . .
>
> (b) The separate concise statement shall assert only the material facts
> that are necessary for the court to determine the issues presented in the
> motion.  Each factual assertion shall be a single sentence, followed by
> a citation to a particular affidavit, deposition, or other document that
> supports the assertion. . . .  Each citation shall particularly identify the
> page and portion of the page of the document referenced. . . .
>
> (c) The concise statement in support of or in opposition to a motion
> for summary judgment shall not exceed five (5) pages . . . .
>
> (d) A separate concise statement may utilize a single-space format for
> the presentation of the facts and evidentiary support only when set out
> in parallel columns, but a column format is not required.
>
> (e) Any party who opposes the motion [for summary judgment] shall
> file and serve with the opposing documents a separate document
> containing a single concise statement that admits or disputes each fact
> set forth in the movant's concise statement.  The opposing party shall,
> if appropriate, admit in part and deny in part a fact asserted by the
> movant, stating specifically what is admitted and what is denied.  The
> opposing party shall also assert, in a separate section of its concise
> statement, any additional facts the party believes the court should

consider, set forth in the same manner as in the movant's concise statement, as described in LR 56.1(b). . . .

LR 56.1(a)–(e).  Thus, LR 56.1(e) allows a non-movant to file a CSF that both admits or disputes the facts set forth in the movant's CSF and provides "any additional facts" for consideration.

Defendants contend that, in commanding that "[t]he concise statement . . . in opposition to a motion for summary judgment shall not exceed five (5) pages," the "plain language" of LR 56.1(c) provides that the *entire opposing CSF*, to include responsive and additional facts, must be less than five pages.  *See* Dkt. No. 303 at 3.  The fact that Fatai's submission (*see* Dkt. No. 294) does not do so, according to Defendants, means it must be stricken in some fashion.

The Court disagrees.  LR 56.1(c)'s "concise statement . . . in opposition to a motion for summary judgment," is not clearly defined, meaning a reference solely to the rule does not explicitly answer the question presented.  Instead, the Court must rely on common sense and historical practice.  In doing so, the Court first agrees with Fatai's observation that the length of the responsive portion of a CSF "will necessarily depend on the nature and length of the movant's CSF."  *See* Dkt. No. 300 at 6.  In other words, where, as here, the CSF itself is a full five pages, and given that the responsive CSF must admit or dispute each fact from the movant's original filing, with citations to evidence, it stands to reason that the responsive portion of the CSF would, by itself, take *more space* than the CSF.

27

Furthermore, even if the non-movant *was* able to fit the responsive portion of his CSF within five pages, he would have no pages left over, according to Defendants' argument, for supplemental facts—something LR 56.1(e) explicitly permits. *See also id.* at 7–8; Dkt. Nos. 303-3–13 (providing examples of numerous instances in this District and before this Court when parties have been allowed to file CSFs containing both responsive and supplemental facts that, when combined, exceeded five pages).

Finally, LR 56.1(e) provides that supplemental facts, if any, must be "set forth in the same manner as in the movant's concise statement." The Court interprets this to mean that any supplemental facts must be formatted in the manner described in LR 56.1(b) and are limited in length by LR 56.1(c) to the same extent as the movant's concise statement—five pages—precisely the length of Fatai's supplemental facts. Dkt. No. 294 at 14–18.

The Motion to Strike is DENIED.

## II.   Motion for Summary Judgment

The claims at issue are: Count I (Malicious Prosecution under Federal Law); Count II (Illegal Seizure of Fatai's Lexus); Count III (Due Process Violations under *Tatum*, *Devereaux*, and *Brady*); Count VII (Intentional Infliction of Emotional Distress); Count VIII (Negligent Infliction of Emotional Distress); Count IX (Civil Conspiracy); Count X (Malicious Prosecution under State Law);

28

and Count XI (Abuse of Process), all asserted against Ramos and Muraoka in their individual capacities.

The MSJ is DENIED as to all remaining claims because, as described in the Factual Background section above, and discussed further below, there are genuine disputes over material facts pertinent to each claim, most notably, those relating to (i) Defendants' deliberate misrepresentation of Medford's credibility and reliability; (ii) Defendants' deliberate misrepresentation of the extent of their search and surveillance of Medford before, during, and after the August 24, 2011 controlled buy; and (iii) Defendants' deliberate suppression of their August 24, 2011 post-buy search of Fatai and his Lexus that turned up no buy money, drugs, or other contraband.

As an initial matter, Defendants claim that the disputed facts in this case "were raised and rejected by the [2012 state trial j]udge many times," apparently implying that this Court should not consider them now. *See* DCSF ¶ 62; DFCSF ¶ 39 ("Any purported 'misconduct' by Defendants was argued and rejected in the criminal proceedings."); Dkt. No. 272-13 at 23–25 (showing Fatai's 2012 defense counsel raised the issue of the absence of a search of Medford and her SUV prior to the operation, along with issues of Medford's credibility, yet unsuccessfully moved to dismiss the case on those bases). If Defendants intended to present a collateral estoppel-type argument, they have done an extremely poor job doing so.

Nowhere, for instance, is the law or standard relating to collateral estoppel ever presented, nor do Defendants provide any detail regarding what the state court might have known at what point in time. Clearly, additional facts have been elicited during the course of this case to which the state court was not privy. Under these circumstances, what the state court did or did not do in 2012, 2015, 2018 or at any other point in time is of little relevance, and the Court declines to consider the argument any further.

###    A.    Count I: Federal Malicious Prosecution[28]

Fatai must prove that the proceedings against him (1) were instituted without probable cause and (2) with malice, and (3) were terminated in his favor. *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004); *Wong v. Cayetano*, 143 P.3d 1, 18 (Haw. 2006). Malice exists if "the 'motive in instituting' the suit . . . [was] without probable cause and for a purpose other than bringing the defendant to justice." *See Thompson*, 142 S. Ct. at 1338. An indictment by a grand jury is *prima facie* evidence of probable cause. *See Awabdy*, 368 F.3d at 1066; *see also Degroot v. United States*, 786 Fed. Appx. 638, 642 (9th Cir. 2019). To rebut that *prima facie* evidence, a plaintiff must prove that the "criminal prosecution was

---

[28]Defendants mistakenly discuss this claim in two sections—one under *Manuel v. City of Joliet*, 137 S Ct. 911 (2017) and one under *Thompson v. Clark*, 142 S. Ct. 1332 (2022). *See* Dkt. No. 271-1 at 16–18, 21–22. As Fatai points out, *see* Opp. at 17, these claims are one and the same. *See Thompson*, 142 S. Ct. at 1337; *see also* Dkt. No. 239 at 8, 10–12 (this Court's prior Order explaining that the two cases concern the same claim, and clarifying that claim).

induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *See Awabdy*, 368 F.3d at 1067.

Defendants claim there is an absence of a genuine dispute of material fact as to the first two elements.[29]  The Court does not agree.  With regard to the first element, despite Fatai having been indicted by a state grand jury, there is a genuine dispute of fact as to whether the proceedings against him were instituted and maintained without probable cause.  There is evidence, for instance, that the probable cause determination was induced by fabrication or other wrongful conduct undertaken in bad faith.  *See id.*  Namely, and most notably, Ramos and Muraoka arguably conspired with two unidentified solo bike officers to search Fatai and his vehicle on August 24, immediately following the controlled operation in which Fatai was supposed to have sold an ounce of methamphetamine to Medford in exchange for $1,900.  *See supra* at 9, 17.  Fatai asserts that this search occurred, which, if true, should have produced the $1,900 in buy money that he had then only recently received from Medford.  It did not, suggesting that no sale had, in fact, occurred.  These developments were never disclosed by the officers,

---

[29]Defendants additionally claim the two-year statute of limitations has run.  The Court does not see how.  Here, from his first indictment in August 2011 until the final dismissal in January 2018, Fatai was under constant prosecution and incarceration.  Defendants do not identify a two-year window when one, the other, or both was not the case, such that, for example, any limitations period would not have been tolled as a result of incarceration.  Moreover, given that the third element of a malicious prosecution claim does not accrue until the proceedings are dismissed, *see Thompson*, 142 S. Ct. at 1341, Fatai's December 2019 complaint could only have been timely.  *See also* Dkt. No 99 at 21–23.

including when presenting their case for further consideration by the prosecuting

attorney and, eventually, the state court judge.  In fact, instead of acknowledging

they had been duped by Medford, the officers doubled down and continued

working with Medford to pursue an arrest of Fatai two days later.

On August 25, with the return of the lab report, the officers learned that the

baggie Medford had given them contained *two ounces* of methamphetamine, rather

than the one that had been expected.  *See supra* at 8 n.12.  In the light most

favorable to Fatai, the officers decided to report that they knew about the weight

discrepancy all along because Medford had alerted them to it on August 24.[30]

The officers marched on.  In pursuit of Fatai, they omitted from their warrant

and reports the thoroughness of their searches of Medford and information

challenging her reliability.  *See supra* at 11–17 (noting the undisputed and disputed

falsehoods).  Finally, they executed their search warrant of Fatai on August 26—

when he was supposed to be meeting Medford for "another" drug sale—and again

found no drugs or contraband.  Medford was the lynchpin behind the officers'

decision to continue pursuing Fatai, *see* DCSF ¶¶ 33, 36, 38 (conceding that

probable cause for Fatai's arrest and prosecution was based on Medford's

---

[30]Since the officers did not document the events of August 24 until later, in contravention of HPD policy, *see supra* at 20 n.24, we cannot know for certain whether or not they knew of the discrepancy before or after the lab report was published.  *See also supra* at 8 n.12.

testimony alone), yet when evidence of the absence of probable cause developed, the officers proceeded anyway.

Taken together, this evidence, viewed in the light most favorable to Fatai, demonstrates a lack of probable cause under *Thompson*'s first element.  *See* 142 S. Ct. at 1338; *Manuel v. City of Joliet*, 137 S Ct. 911, 920 n.8 (2017) ("Whatever its precise form, if the proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights . . . ."); *Milstein v. Cooley*, 257 F.3d 1004, 1011 (9th Cir. 2001) (finding probable cause was lacking because the prosecutor and other defendants "concocted the essential facts," including fabricated statements from a witness); *Awabdy*, 368 F.3d at 1067 (holding no probable cause where "the criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct").

To be sure, Defendants dispute most, if not all, of the facts on which Fatai relies, including that an August 24, 2011 post-buy search occurred.  They claim that Muraoka followed Fatai out of the Chuck E. Cheese parking lot while driving a marked police vehicle and wearing a police uniform, witnessed Fatai commit a traffic violation, conducted a traffic stop for the sole purpose of obtaining Fatai's identity, and then, having accomplished that objective, released Fatai without

conducting any search.  DCSF ¶¶ 21; Muraoka Decl. ¶¶ 26, 34–37.  Muraoka

claims he "was alone, by design," and that no other officers, including no solo bike

officers, participated in the traffic stop.  DCSF ¶ 22; Muraoka Decl. ¶¶ 26, 37.

Defendants claim that Fatai's account is "implausible and doesn't even make

sense,"[31] and imply that the only evidence in the record to support Fatai's version

of events is his own deposition.  *See* DRCSF ¶ 7; Ramos Decl. ¶¶ 43–46.

However, as the Court explained *supra* at 9 n.13, other evidence in the record

supports Fatai's version.[32]  *See also, e.g.*, *supra* at 20 (discussing the officers'

flawed account of the timeline of August 24 events).  Moreover, even if Fatai's

deposition *was* the only evidence supporting his side, the weight or amount of

evidence on each side is not what matters at this stage—what matters is whether

there is a dispute of fact.  *See* Fed. R. Civ. P. 56(a); *Nigro v. Sears*, 784 F.3d 495,

---

[31]Their assertion is based, in part, on the fact that there were no solo bike officers assigned to District 8's Weed and Seed detail, and solo bike or traffic control officers were not privy to the radio channel used by Weed and Seed, CRU channel 8.  DRCSF ¶ 7; Ramos Decl. ¶¶ 43–46.  None of that is determinative.  Moreover, there is evidence that Muraoka used radio channels other than channel 8, on August 24.  *See* Ramos Dep-1 at 208:16–209:2 (confirming that there were other units in the area who were not part of the investigative team); *ibid.* at 308:19–309:7 (stating that Muraoka used the "main radio line," as opposed to channel 8, to communicate with dispatch and execute the traffic stop); Nahulu Dep. at 22:9–23:12 (stating that solo bike officers did not work specifically in District 8 but rather patrolled island-wide and reported out of the "main station").

[32]Along with the affirmative evidence previously cited in this Order, the Court notes that portions of Defendants' evidence *detract* from their own version of events.  For instance, Ramos' second deposition tends to cast doubt not only on his own Declaration, on which Defendants rely for their entire concise statement, but also on his credibility more generally.  *See generally* Second Deposition of Mark Ramos ("Ramos Dep-2"), Dkt. No. 291-28; *see also* Muraoka Dep-2 at 26:7–10 (noting Muraoka stated in a 2019 email to the prosecutor, after reviewing his testimony transcript, "I hate not knowing whether I said what I said correctly or not").

497–98 (9th Cir. 2015) (holding that even self-serving and uncorroborated deposition testimony, so long as it states facts and is not conclusory, must be considered as evidence on summary judgment); *United States v. Shumway*, 199 F.3d 1093, 1104 (9th Cir. 1999) ("That an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of establishing a genuine issue of material fact.").

With regard to *Thompson*'s second element, malice, there is significant overlap between this element and the first.  Viewing the facts and inferences in the light most favorable to Fatai, Ramos and Muraoka's motive in referring the case to the DPA was "for a purpose other than bringing the defendant to justice."  *See Thompson*, 142 S. Ct. at 1338.  As described above, there is a genuine dispute of material fact as to whether the officers *intentionally* misrepresented and omitted important evidence and, therefore, whether they acted with the purpose of pursuing Fatai's arrest and prosecution, regardless of his guilt.  Indeed, on July 7, 2016, following the second mistrial, nearly five years of prosecutorial efforts, and the denial of Fatai's motion to dismiss the case, Dkt. No. 272-13 at 17, the prosecutor sent a group email, including to Ramos and Muraoka, stating, "Also for the police officers—yes, this [] also means Defendant stays in custody even longer [smiley face emoji]"—indicating that the officers would be personally pleased to hear Fatai

would remain incapacitated.  Dkt. No. 291-29 at 10.[33]  As there is a genuine

dispute of fact as to both essential elements of Count I, summary judgment is not

warranted on this claim.

    B.   <u>Count II: Illegal Seizure of Personal Property</u>

In order to prevail on Count II, Fatai must show that Defendants had no

probable cause to believe he had used his car to facilitate a drug crime.  With

regard to the merits of this claim, as discussed *supra* at 30–36, there is a genuine

dispute of material fact as to whether probable cause existed, precluding summary

judgment.

Procedurally, Defendants assert a statute of limitations defense, arguing

Fatai should have sought the return of his vehicle while his criminal prosecution

was still ongoing.  As the Court explained in Dkt. No. 99 at 21–23 when it denied

Defendants' motion to dismiss on this same basis, the argument fails.  Fatai's

personal property claim accrued on January 11, 2018 when the charges against him

were dropped.  *See id.*; *see also McDonough v. Smith*, 139 S. Ct. 2149, 2156–58

(2019) (holding that, if a claim relates to a prosecution, the statute generally begins

to run when the prosecution ends in a manner that is favorable to the plaintiff)

---

[33]Although neither officer admitted that they understood why the prosecutor wrote this statement, nor that they were "happy" or "glad" Fatai would remain incarcerated, it is reasonable to infer that they were, when considering the evidence in the light most favorable to Fatai.  *See also* Ramos Dep-2 at 32:5–36:6 (stating that the prosecutor's email did not bother him and was not inappropriate).

(citing *Heck v. Humphrey*, 512 U.S. 477, 484–85 (1994)); *Thompson*, 142 S. Ct. at 1341 (noting that favorable termination occurs when the charges are dismissed). His December 2019 complaint, filed within two years of accrual, is therefore timely.

C.   Count III: Due Process Claims

1.   *Tatum* "Failure-to-Disclose"

Under *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014), a state official violates the Fourteenth Amendment's Due Process Clause if he (1) fails to disclose (2) highly significant or potentially dispositive exculpatory evidence to prosecutors, (3) through "conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks," (4) leading to plaintiff's detention of "unusual length." *Id.* at 819–20.  In order to be considered highly significant or exculpatory to the point of being potentially dispositive, the suppressed evidence must be not only material but "*strongly* indicative of the plaintiff's innocence." *Id.* at 820.  "[O]fficial conduct violates due process only when it shocks the conscience, a standard satisfied in circumstances [where officers] either consciously or through complete indifference disregard[ed] the risk of an unjustified deprivation of liberty." *Id.* at 820–21.  While *Tatum* did not define a detention of "unusual length," it found twenty-seven months to have met the standard.  768 F.3d at 820.

As described *supra* at 32–38, there is certainly a genuine dispute as to whether Defendants failed to disclose highly exculpatory evidence, in the form of Muraoka and two solo bike officers' August 24 search of Fatai's vehicle. Especially given that the August 24 controlled buy was the only substantial evidence implicating Fatai, this fruitless search was "highly significant" and "potentially dispositive" exculpatory evidence. *See Tatum*, 768 F.3d at 819–20.

With regard to the officers' culpability, there is no doubt that the officers "understood the risks to [Fatai]'s rights from withholding the information or were completely indifferent to those risks." *See id.* They knew they were referring the case to the prosecutor for the initiation of charges, they knew the charges were initiated, and they participated in the prosecution by testifying before the grand jury and during two trials and by remaining abreast of the developments of the case over a period of seven-plus years.

Finally, with regard to causation and a detention of "unusual length," Fatai's three detentions—for a combined twenty-eight months—certainly suffice. *See id.* at 820. Defendants, however, appear to contend Fatai's third detention, which constituted the vast bulk of his incarceration time, should not be attributed to them because it was the product of a bail revocation arising out of Fatai threatening Medford in an elevator and later violating curfew. Dkt. No. 271-1 at 18–20. Nonetheless, Defendants have provided no legal authority for their assertion that

an intervening cause, in effect, attenuated proximate causation. *See id.*; *cf.*
*Caldwell v. City & Cnty. of S.F.*, 889 F.3d 1105, 1117 (9th Cir. 2018) (finding that
fabrications that become a part of the evidentiary record raise a trial issue as to
causation, despite the "presumption of prosecutorial independent judgment");
*Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007) (holding officers
who submit false reports "to the prosecutor may be held liable for damages
incurred as a proximate result of those reports") (citing *Barlow v. Ground*, 943
F.2d 1132, 1136 (9th Cir. 1991)).[34]  Fatai was in the position he was in in the first
place because of the officers' investigation and because of the information they
provided to DPA. Thus, their actions actually and proximately caused Fatai's
unusually lengthy incarceration.

> 2.    *Devereaux* "Fabrication-of-Evidence"

Under *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en
banc), "there is a clearly established constitutional due process right not to be
subjected to criminal charges on the basis of false evidence that was deliberately
fabricated by the government."  To prove a fabrication-of-evidence claim, a

---

[34]*See also Gregory v. City of Louisville,* 444 F.3d 725, 741 (6th Cir. 2006) (holding that the
"very existence" of officer's investigatory notes containing "pretrial fabrication efforts by [the
officers]," which "comprise[d] part of the documentary record" affected the criminal
prosecution, even if those notes were not admitted at trial); *Jones v. City of Chicago,* 856 F.2d
985, 993-94 (7th Cir. 1988) (holding police officers could be held liable when they "deliberately
supplied misleading information that influenced the decision" of the prosecutor to pursue the
case); *Halsey v. Pfeiffer,* 750 F.3d 273, 289, 294 n.19 (3rd Cir. 2014) (holding defendant suffered
an injury when fabricated evidence was used to initiate a prosecution).

plaintiff must allege that "(1) the defendant official deliberately fabricated evidence; and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

Deliberate fabrication can be shown by either "direct evidence of fabrication" or "circumstantial evidence related to a defendant's motive." *Caldwell*, 889 F.3d at 1112. Direct fabrication occurs where officers "deliberately mischaracterize[]" evidence. *Spencer*, 857 F.3d at 798; *see also Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1112 (9th Cir. 2010) ("[A]n interviewer who deliberately mischaracterizes witness statements in her investigative report also commits a constitutional violation."). It also occurs if the "defendants continued their investigation . . . despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Caldwell*, 889 F.3d at 1112 (quoting *Devereaux*, 263 F.3d at 1076).

Even though Defendants are correct that "not all inaccuracies in investigative reports give rise to a constitutional claim," *see* Dkt. No. 271-1 at 11 (citing *Spencer*, 857 F.3d at 798), and, indeed, that even a "reckless" investigation would not necessarily do so, *see* Dkt. No. 271-1 at 12 (citing *Gomez v. Whitney*, 757 F.2d 1005, 1006 (9th Cir. 1985) (per curiam)), the instant case concerns far

more than inaccuracies and/or recklessness.  There is a genuine dispute over Ramos and Muraoka's deliberate and malicious actions, *see supra* at 30–36, which caused Fatai's prosecution and detention, *see supra* at 38–39.  Summary judgment is not warranted.

### 3.   *Brady* Suppression of Material Evidence

Fatai must show that Defendants (1) suppressed material evidence that deprived him of a fair trial, and that (2) "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Richards v. Cnty. of San Bernardino*, 39 F.4th 562, 572–573 (9th Cir. 2022) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

Element one has been addressed in the discussions above, *see supra* at 30–36, and there is a genuine dispute of material fact with regard to element two.  The suppressed evidence—most importantly, the fruitless August 24 search—was highly exculpatory as to Fatai and would have impeached the *only* evidence against him.  Moreover, even with the suppression of this evidence, his second trial still ended in a hung jury with three jurors declining to convict.  Thus, there is a reasonable probability that "the result of the proceeding would have been different" if Defendants had disclosed the evidence Fatai claims existed, rendering summary judgment inappropriate on his *Brady* claim.  *See id.*

###### D.     Count VII: Intentional Infliction of Emotional Distress

Fatai must show that Defendants committed an "outrageous" act, intentionally or recklessly, which caused him extreme emotional distress.  *Hac v. Univ. of Haw.*, 73 P.3d 46, 60–61 (Haw. 2003).  Outrageous conduct is that which "exceed[s] all bounds usually tolerated by decent society and which is of a nature especially calculated to cause . . . mental distress of a very serious kind."  *Id.* at 60.

Here, there is a genuine dispute as to whether Ramos and Muraoka ignored and/or suppressed highly significant exculpatory evidence, maliciously prosecuted an individual they knew or should have known was innocent, and enjoyed the fact of his incarceration, even absent a conviction.  *See supra* at 32–38.  By any measure, viewing these facts in Fatai's favor, this is outrageous conduct that, as discussed *supra* at 38–39, caused Fatai's twenty-eight month detention.[35]  Summary judgment is denied.

###### E.     Count VIII: Negligent Infliction of Emotional Distress

Defendants offer no argument or evidence relating to this claim.  *See generally* Dkt. No. 271-1.  Accordingly, summary judgment is inappropriate.

---

[35]Defendants only claim that their conduct was not "unreasonable or outrageous."  They do not challenge the other elements of an IIED claim—whether their conduct caused Fatai to experience "extreme emotional distress."  *See* Dkt. No. 271-1 at 24–25.

F.   Count IX: Civil Conspiracy (State Law)

In Hawaiʻi, civil conspiracy is defined as the "combination of two or more persons or entities by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means."  *Miyashiro v. Roehrig, Roehrig, Wilson, & Hara*, 228 P.3d 341, 362 (Haw. 2010) (quoting *Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co.*, 982 P.2d 853, 881 n. 28 (Haw. 1999)).

Defendants' only argument regarding this claim is that "mere acquiescence or knowledge is insufficient to constitute conspiracy," and "[t]here is simply no evidence that Muraoka and/or Ramos conspired with anyone."  Dkt. No. 271-1 at 25.  While their first proposition is true, there is a genuine dispute of fact as to whether they each did much more than acquiesce and conspired—at the very least, *with each other*—in violation of state law.  Summary judgment is denied.

G.   Count X: Malicious Prosecution (State Law)

The elements of a state law claim of malicious prosecution mirror those of federal law.  *See Wong*, 143 P.3d at 18.  Therefore, as explained *supra* at 30–36, there is a genuine issue of material fact as to this claim.  Even assuming that Hawaiʻi's limitation of liability "to only the most guilty officials," *see Medeiros v. Kondo*, 522 P.2d 1269 at *2 (Haw. 1974), imposes a higher standard than federal law, there is a genuine dispute as to whether that standard is met here, where police

43

officers intentionally pursued prosecution of an individual without regard to his innocence. *See also Runnels v. Okamoto*, 525 P.2d 1125, 1129 (Haw. 1974) (holding that "the existence or absence of malice is generally a question for the jury").

H.   Count XI: Abuse of Process

To prevail on this claim, Fatai must show two essential elements: "(1) an ulterior purpose; and (2) a willful act in the use of the process which is not proper in the regular conduct of the proceeding." *Young  v. Allstate Ins. Co.*, 198 P.3d 666, 675 (Haw. 2008).  Defendants again make little to no argument to refute this claim (*see* Dkt. No 271-1 at 25), and, particularly viewing the facts set forth above in the light most favorable to Fatai, it is not difficult to see why: there is ample evidence of an ulterior purpose driving an irregular process.  Summary judgment is denied.

## CONCLUSION

As Defendants have not demonstrated the absence of a genuine issue of material fact as to any of the SAC's remaining claims, Counts I–III and VII–XI,

*see Soremekun*, 509 F.3d at 984, the Motion for Summary Judgment, Dkt. No. 271, is DENIED.

IT IS SO ORDERED.

DATED: March 7, 2023 at Honolulu, Hawai'i.

Derrick K. Watson
Chief United States District Judge

*Sefo Fatai v. Mark Ramos, et al.;* Civil No. 19-00603 DKW-WRP; **ORDER DENYING DEFENDANTS' (1) MOTION TO STRIKE AND (2) MOTION FOR SUMMARY JUDGMENT**